1  Bardis Vakili (SBN 247783) (bvakili@aclusandiego.org)
2  David Loy (SBN 229235) (davidloy@aclusandiego.org)
   ACLU FOUNDATION OF SAN DIEGO &
3  IMPERIAL COUNTIES
   P.O. Box 87131
4  San Diego, CA 92138-7131
5  Telephone: (619) 398-4485

6  Craig E. Countryman (SBN 244601) (countryman@fr.com)
7  Joanna Fuller (SBN 266406) (jfuller@fr.com)
   Aleksandr Gelberg (SBN 279989) (gelberg@fr.com)
8  Megan A. Chacon (SBN 304912) (chacon@fr.com)
9  FISH & RICHARDSON P.C.
   12390 El Camino Real
10 San Diego, CA 92130
11 Telephone: (858) 678-4050

12 Leonard B. Simon (SBN 58310) (lens@rgrdlaw.com)
13 LAW OFFICES OF LEONARD B. SIMON P.C.
   655 West Broadway, Suite 1900
14 San Diego, CA  92101
15 Telephone: (619) 338-4549

16 Counsel for Plaintiff-Petitioners

17

18              UNITED STATES DISTRICT COURT

19            SOUTHERN DISTRICT OF CALIFORNIA

20 JOSE ORLANDO CANCINO            Case No. **'17CV491   BAS BGS**
   CASTELLAR, ANA MARIA
21 HERNANDEZ AGUAS, MICHAEL        **COMPLAINT – CLASS ACTION**
   GONZALEZ,                       **AND PETITION FOR WRIT OF**
22                                 **HABEAS CORPUS**
23            Plaintiff-Petitioners,
24
        v.
25
26 JOHN F. KELLY, Secretary of Homeland
   Security; THOMAS HOMAN, Acting
27 Director, U.S. Immigration and Customs
   Enforcement; KEVIN K. McALEENAN,
28

1  Acting Commissioner, U.S. Customs and
2  Border Protection; GREGORY J.
   ARCHAMBEAULT, Director, San Diego
3  Field Office, U.S. Immigration and
4  Customs Enforcement; JEFFERSON B.
   SESSIONS III, Attorney General of the
5  United States; JUAN P. OSUNA, Director,
   Executive Office for Immigration Review,
6
7                    Defendant-Respondents.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **INTRODUCTION**

1.      This suit challenges Defendant-Respondents' policy and practice of detaining individuals for extended periods without promptly presenting them for an initial hearing before an immigration judge or promptly seeking judicial review of probable cause for detention.  As a result, many individuals—including people with claims to U.S. citizenship, longtime lawful permanent residents, individuals who have been in the United States since childhood, and asylum seekers fleeing persecution— routinely languish in detention for two months or longer before they see a judge, in violation of the Constitution and applicable law.

2.      The requirement of prompt presentment after arrest "stretches back to the common law, when it was 'one of the most important' protections 'against unlawful arrest.'" *Corley v. United States*, 556 U.S. 303, 320 (2009).  Excessive delays in judicial presentment deprive immigration detainees of due process, prevent them from exercising important rights and remedies, impede the progress of removal proceedings, and bear no reasonable relation to any valid purpose.

3.      The first hearing before an immigration judge, like first appearance in criminal court, is critical to ensuring due process.  For example, it ensures that detainees can learn the charges against them;[1] receive important advisals about their rights;[2] contest threshold allegations about their status, custody, or bond; request the

---

[1] *See* EOIR Immigration Judge Benchbook ("IJ Benchbook"), *Advisals, available at* https://www.justice.gov/sites/default/files/eoir/legacy/2014/08/15/Advisals.pdf; IJ Benchbook, *Initial Hearing, available at* https://www.justice.gov/eoir/page/file/924086/download

[2] At the initial hearing, immigration judges may identify relief available to detainees and, for unrepresented individuals, must provide appropriate guidance as to how they may prove they are eligible for it.  *See Agyeman v. I.N.S.,* 296 F.3d 871, 883-84 (9th Cir. 2002).

1   evidence the government intends to use against them;[3] and improve their chances of

2   securing *pro bono* counsel.[4]  The current delays in providing the first appearance prevent

3   detainees from receiving those important protections and advisals in a timely manner.

4          4.      Furthermore, the Department of Homeland Security (DHS) has a policy

5   and practice of detaining individuals without seeking or obtaining judicial review of

6   probable cause promptly after arrest, as required by the Fourth Amendment.  Instead,

7   the decision to retain a person in custody is made by DHS officials alone without

8   prompt judicial review.  "Judicial review" in this context includes at least review by an

9   immigration judge.

10         5.      The United States Immigrations and Customs Enforcement (ICE), a

11  component of DHS, currently operates two large immigration detention centers in the

12  Southern District of California where individuals are subjected to civil detention: (1) the

13  Otay Detention Facility and (2) the Imperial Regional Detention Facility.  The United

14  States Customs and Border Protection (CBP), another component of DHS, also

15  detains individuals without final removal orders beyond 48 hours, many of whom will

16  be placed in removal proceedings in various facilities throughout the Southern District

17  of California.  Plaintiff-Petitioners are examples of around 1,500 alleged non-citizens

18  detained by DHS in this district on any given day.  The vast majority of such detainees

19  have waited or are currently waiting between one to three months for a first hearing

20  before a judge, and most are indigent and unrepresented by counsel.

21         6.      Plaintiff-Petitioners' lengthy detention without judicial appearance or

22  determination of probable cause results from several actions of Defendant-

23  _____

24  [3] *See Dent v. Holder*, 627 F.3d 365, 374 (9th Cir. 2010); 8 U.S.C. § 1229a(c)(2)(B).

25  [4] At the initial hearing, the immigration judge ensures that the individual has received a
26  list of available free legal service providers.  8 C.F.R. § 1240.10(a)(2).  In addition, *pro se*
    appearance at the initial hearing places individuals on a list of unrepresented detainees
27  generated by Executive Office of Immigration Review, which it may then circulate to
28  non-profit organizations that represent indigent detainees.

Respondents.  First, DHS detains individuals allegedly subject to removal without regard for the immigration court's ability to commence and process the cases promptly. Second, it confines individuals for removal proceedings without meaningful judicial oversight, such as a judicial finding of probable cause or automatic custody review hearing before an immigration judge.  Third, DHS relies on the immigration court system to set the initial hearing date and takes no responsibility for presenting detainees to the court promptly.

7.    Defendant-Respondents' policy and practice results in unreasonable extended detention for Plaintiff-Petitioners and those similarly situated to them without prompt presentment to a judge or a judicial review of probable cause.

8.    Therefore, Plaintiff-Petitioners seek declaratory, injunctive, and habeas corpus relief that will prevent Defendant-Respondents from detaining individuals for an unreasonable period before presentment to a judge or a judicial review of probable cause for their detention.

## PARTIES

9.    Plaintiff-Petitioner Jose Orlando Cancino Castellar is presently detained by DHS at the Otay Detention Facility.  DHS alleges he is a native and citizen of Mexico and subject to removal from the United States.

10.    Plaintiff-Petitioner Ana Maria Hernandez Aguas is presently detained by DHS at the Otay Detention Facility.  On information and belief, DHS alleges she is a native and citizen of Mexico and subject to removal from the United States.

11.    Plaintiff-Petitioner Michael Gonzalez is presently detained by DHS at the Otay Detention Facility.  On information and belief, DHS alleges he is a native and citizen of Mexico and subject to removal from the United States.

12.    Defendant-Respondent John F. Kelly is the Secretary of the U.S. Department of Homeland Security, an agency of the United States with several components responsible for enforcing United States immigration laws.  Secretary Kelly

is a legal custodian of Plaintiff-Petitioners and other members of the proposed class. He is sued in his official capacity.

13. Defendant-Respondent Thomas Homan is the Acting Director of U.S. Immigration and Customs Enforcement, a component of DHS. ICE is responsible for, among other things, the seizure and detention of alleged noncitizens for removal proceedings and for prosecuting those removal proceedings. Acting Director Homan is a legal custodian of Plaintiff-Petitioners and other members of the proposed class. He is sued in his official capacity.

14. Defendant-Respondent Kevin K. McAleenan is the Acting Commissioner of U.S. Customs and Border Protection, a component of DHS. CBP is responsible for, among other things, the seizure and detention of alleged noncitizens believed to be in the United States in violation of the law or at a port of entry seeking asylum. Acting Commissioner McAleenan is a legal custodian of members of the proposed class. He is sued in his official capacity.

15. Defendant-Respondent Gregory Archambeault is the Field Office Director for the San Diego Field Office of ICE, a component of DHS. Director Archambeault has custody of Plaintiff-Petitioners and other members of the proposed class, who are primarily detained in the Otay Detention Facility and the Imperial Regional Detention Facility, both of which are within the jurisdiction of ICE's San Diego Field Office. He is sued in his official capacity.

16. Defendant-Respondent Jefferson B. Sessions III is the Attorney General of the United States and the most senior official in the U.S. Department of Justice (DOJ). He has the authority to interpret the immigration laws and adjudicate removal cases. The Attorney General delegates this responsibility to the Executive Office for Immigration Review (EOIR), which administers the immigration courts and the Board of Immigration Appeals. He is sued in his official capacity.

17.     Defendant-Respondent Juan P. Osuna is the Director of EOIR, the agency within DOJ responsible for the immigration courts that administer removal proceedings, including the scheduling of all hearings in such proceedings, initial or otherwise.  He is sued in his official capacity.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal questions), 1361 (mandamus), 1651 (all writs act), 2241 (habeas corpus), and 5 U.S.C. §§ 702, 706 (review of agency action).  Sovereign immunity against actions for relief other than money damages is waived pursuant to 5 U.S.C. § 702.

19.     This Court may grant relief under 28 U.S.C. §§ 2241, 2243 and 8 U.S.C. 1252(e)(2) (habeas corpus), 28 U.S.C. §§ 2201-02 (declaratory relief), 28 U.S.C. § 1651 (all writs act), 5 U.S.C. § 702 (judgment against U.S. officers), Federal Rule of Civil Procedure 65 (injunctive relief), as well as the Fourth and Fifth Amendments to the U.S. Constitution.

20.     Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(e) because Plaintiff-Petitioners are detained in this district, and a substantial part of the events or omissions giving rise to Plaintiff-Petitioners' claims occurred in this district.

## LEGAL AND PROCEDURAL BACKGROUND

**I.      Detention Pending Removal Proceedings**

**A.      Initial Apprehension and Referral to Immigration Court**

21.     To remove an allegedly deportable or inadmissible noncitizen from the United States, the government must, with some exceptions, initiate a removal proceeding before an immigration judge under section 240 of the Immigration and Naturalization Act (INA).  8 U.S.C. § 1229a(a).  A removal proceeding begins when an authorized agent of DHS files a Notice to Appear with the immigration court operated by EOIR.  *See* 8 C.F.R. §§ 2.1, 239.1(a), 1239.1.  ICE and U.S. Customs and Border

1   Protection are the two main agencies within DHS that are authorized to initiate

2   removal proceedings.  *See* 8 C.F.R.§ 239.1.

3       22.    Congress has authorized DHS to initially take an alleged non-citizen into

4   custody without a warrant (1) if the individual enters or attempts to enter the United

5   States in violation of the immigration laws in the officer's presence or view, or (2) if the

6   officer reasonably believes the individual is in the United States in violation of the

7   immigration laws and is likely to escape before an arrest warrant can be obtained.  8

8   U.S.C. § 1357(a)(2).  However, after 48 hours DHS must determine whether to

9   continue to keep the person in custody and issue a Notice to Appear.  8 C.F.R.

10  § 287.3(d).  DHS also purports to have authority under applicable regulations to arrest

11  and take into custody an alleged non-citizen pursuant to an administrative warrant "at

12  the time of issuance of the Notice to Appear, or at any time thereafter."  8 C.F.R.

13  § 1236.1(b).  DHS policy and practice is that its agents and officers need not obtain a

14  judicial warrant prior to arrest or a judicial finding of probable cause after arrest.

15      23.    Individuals arriving at a port of entry and seeking asylum take a slightly

16  different procedural route before DHS issues them a Notice to Appear.  If DHS takes

17  the position that individuals arriving at a port of entry have no valid documentation or

18  right to enter the United States, those individuals are generally processed for so-called

19  "expedited removal," for which a hearing before an immigration judge is allowed in

20  very limited circumstances.  8 U.S.C. § 1225(b)(1)(A); 8 C.F.R. §§ 235.3(b)(2)(ii),

21  (b)(5)(iv).  However, when such an individual expresses a fear of persecution if

22  removed, expedited removal is not permitted, and he or she is referred for a credible

23  fear interview before an asylum officer with United States Citizenship and Immigration

24  Services.  8 C.F.R. § 235.3(b)(4).  If the asylum officer determines that the individual

25  has a credible fear, then the case is referred to the immigration court through the

26  issuance and filing of the Notice to Appear.  8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R.

27

28

§ 235.6(a)(1)(ii).  At that point, the case proceeds under section 240 of the INA like any other removal proceeding.  8 C.F.R. § 208.30(f).

**B.    Initial Master Calendar Hearing**

24.    All individuals detained pending removal proceeding are entitled to the same rights and procedures under the INA.  *See generally* 8 U.S.C. § 1229a.

25.    A removal proceeding commences when DHS files the Notice to Appear with the immigration court.  8 C.F.R. § 1003.14.  The Notice to Appear provides the time, place and date of the initial hearing in removal proceedings, also called an initial Master Calendar Hearing, where practicable.  8 C.F.R. § 1003.18(b).  If the Notice to Appear does not contain this information, the immigration court schedules the initial Master Calendar Hearing and provides notice to the government and the alleged noncitizen as to its time, place, and date.  *Id.*

26.    Applicable regulations require that "the removal hearing be completed as promptly as possible."  8 C.F.R. § 1239.2(f).  In addition, cases involving detained individuals must proceed on an expedited docket.  *See* 8 U.S.C. § 1229(d)(1) ("In the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction."); 8 C.F.R. § 1208.5(a) (requiring that, for detained asylum seekers, "[w]here possible, expedited consideration shall be given to applications of detained aliens"); Immigration Court Practice Manual, Chapter 9.1(e).[5]

27.    "[T]he Master Calendar is the pre-trial docket."  IJ Benchbook, *Introduction to the Master Calendar* at 1.[6]  Because it "may take more than one master calendar session to get a case ready," *id.*, a series of Master Calendar Hearings may be held to narrow the

---

[5] https://www.justice.gov/eoir/office-chief-immigration-judge-0.
[6] https://www.justice.gov/sites/default/files/eoir/legacy/2014/08/15/Purpose_and_History_of_MC.pdf.

1   issues in a removal proceedings, until a final hearing is held to decide removability and,

2   if applicable, eligibility for relief from removal.

3        28.     On information and belief, EOIR, which operates the immigration court,

4   is made aware when a Notice to Appear is filed whether the case involves a detained

5   individual or a non-detained individual.  On information and belief, when EOIR

6   receives a Notice to Appear, a clerk enters the information into the court's computer

7   system and generates a hearing date for the next available hearing.  If the case involves

8   a detained individual, EOIR puts the case on the immigration court's detained docket,

9   which is more expedited than its non-detained docket.  However, EOIR does not

10  schedule more expeditious initial Master Calendar Hearings for detainees than it does

11  for subsequent Master Calendar Hearings for detainees.  As a result, EOIR frequently

12  sets the initial Master Calendar Hearing for detained immigration cases in the Southern

13  District of California for one to three months after receiving the Notice to Appear.

14       29.     The initial Master Calendar Hearing is a crucial stage of removal

15  proceedings.  It is the first time a neutral adjudicator (the immigration judge) explains

16  the nature of the removal hearing, the contents of the Notice to Appear "in non-

17  technical language," the right to representation at his or her own expense, and the

18  availability of *pro bono* legal services.  8 C.F.R. § 1240.10(a).  The immigration judge also

19  notifies detainees about the right to see the government's evidence against them and

20  provides the first opportunity to request that evidence.  *Id.*; *see also Dent*, 627 F.3d at

21  374; 8 U.S.C. § 1229a(c)(2)(B).  The immigration judge explains these things in the

22  alleged noncitizen's own language, with the aid of an interpreter.  *See* Immigration

23  Court Practice Manual, Chapter 4.15(f) ("If necessary, an interpreter is provided to an

24  alien whose command of the English language is inadequate to fully understand and

25  participate in the hearing.").  This differs from the Notice to Appear alone, which

26  consists largely of technical legalese in English and thus would not be understandable

27  to someone who is not versed in immigration law or does not read English.

28

8          Case No. _____

30.    The initial Master Calendar Hearing also provides the first opportunity for the immigration judge to verify service of the Notice to Appear, provide the Notice to Appear if service was not made, to examine the Notice to Appear for defects, and demand correction of those defects.  *See* IJ Benchbook, *Introduction to the Master Calendar* at 3 ("The NTA is not prepared by lawyers and there will be errors.").

31.    Importantly, at the initial Master Calendar Hearing, unrepresented detainees who do not speak or write English may, for the first time, request a bond hearing with the aid of an interpreter in their native language.  *See* 8 C.F.R. §§ 1003.19(b), (c) (stating that bond hearings may be requested "orally [in court], in writing, or, at the discretion of the Immigration Judge, by telephone … to the Immigration Court having jurisdiction over the place of detention"); *see* 8 C.F.R. § 1003.33 (requiring immigration court documents to be filed in the English language); Immigration Court Practice Manual, Chapter 4.15(f).  Following the request, the Immigration Judge must schedule the bond hearing at "the earliest possible date."  *See* Immigration Court Practice Manual, Chapter 9.3(d).  For those detainees supposedly ineligible for bond hearings because DHS alleges they are held pursuant to so-called "mandatory detention" authority, the initial Master Calendar Hearing provides the first meaningful time they may request a hearing to challenge the applicability of that authority to their case.  *See In re Joseph*, 22 I. & N. Dec. 799, 800 (BIA 1999); *Tijani v. Willis*, 430 F.3d 1241, 1246-47 (9th Cir. 2005) (Tashima, J., concurring).

32.    At the initial Master Calendar Hearing, the immigration judge may identify several forms of relief for which the detainee may be eligible, allowing the detainee to begin working on his or her case after the hearing.  For unrepresented individuals, the judge must assist the detainee in doing so.  *See Agyeman,* 296 F.3d at 883-84 (explaining the immigration judge "has a duty to fully develop the record when an alien proceeds *pro se* by probing into relevant facts and by providing appropriate guidance as to how the alien may prove his application for relief").  This is crucial in detained cases, as

individuals "may have limited access to relevant documents and will, therefore, depend even more heavily on the [immigration judge] for assistance in identifying appropriate sources of evidence to support his claim." *Id.*

33.    On information and belief, for detainees who cannot afford a private attorney, the *pro se* appearance at the initial Master Calendar Hearing places their name on an EOIR-generated list of unrepresented detainees, which EOIR may then circulate to non-profit organizations that provide *pro bono* representation.  Detainees who have not appeared at an initial Master Calendar Hearing do not appear on those lists.

34.    The initial Master Calendar Hearing also provides ICE attorneys and the immigration judges their first opportunity to speak with and observe detainees who may be eligible for appointed counsel as a result of incapacity due to mental health.  *See Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG (DTBx), 2013 WL 3674492, at *8 (C.D. Cal. Apr. 23, 2013).  Because Defendant-Respondents consider the medical facilities and medical staff at the Otay Detention Facility to be well-equipped to handle cases involving mental health issues, they confine a substantial number of detainees with mental health issues at Otay who may qualify for appointed counsel.

## II.    Due Process Rights of Detainees

35.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be … deprived of life, liberty, or property, without due process of law." Under the Due Process Clause, "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *United States v. Salerno*, 481 U.S. 739, 748, 755 (1987).  Detention "for any purpose constitutes a significant deprivation of liberty that requires due process protection."  *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

36.    For immigration detainees, as with other civil detainees, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" protected by the Due Process Clause.

*Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  Although immigration authorities "may intercept individual aliens and subject them to hearings for the purpose of determining whether they are deportable and restrain them of their liberties for enforced deportation after hearing, . . . detention for long and unreasonable periods before hearing is illegal." *Carlson v. Landon*, 186 F.2d 183, 186 (9th Cir. 1950).

37.    "The first appearance has such great value in protecting numerous rights that its denial presumptively disrupts those rights.  Therefore, as a matter of constitutional prophylaxis, the denial of a first appearance offends the Due Process Clause." *Armstrong v. Squadrito*, 152 F.3d 564, 573 (7th Cir. 1998).

### A.    Procedural Due Process Requires Prompt Post-Arrest Hearing

38.    The Due Process Clause usually "requires . . . a hearing before the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  If a pre-arrest hearing is not viable, due process mandates a "prompt post-deprivation hearing at which some showing of the probable validity of the deprivation must be made." *Comm'r of Internal Revenue v. Shapiro*, 424 U.S. 614, 629 (1976).[7]  Therefore, "[p]romptness is the touchstone" of due process "analysis into the timeliness of post-deprivation review." *Jordan v. Jackson*, 15 F.3d 333, 349 (4th Cir. 1994).

39.    To determine if a post-arrest hearing is sufficiently prompt to satisfy the Due Process Clause, courts consider three distinct factors:  (1) "the private interest that

---

[7]  An officer's decision to make an arrest, even if supported by probable cause and authorized by the Fourth Amendment, does not satisfy the due process requirement for a prompt hearing on the continued validity of detention pending a merits hearing. *See Krimstock v. Kelly*, 306 F.3d 40, 53 (2d Cir. 2002) (holding that "warrantless arrest by itself does not constitute an adequate, neutral 'procedure' for testing the City's justification for continued and often lengthy detention of a vehicle" pending forfeiture proceedings).  Cases on deprivation of property apply with equal strength to deprivation of liberty. *See Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974) ("This analysis as to liberty parallels the accepted due process analysis as to property," because "a person's liberty is equally protected.").

will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

40.    Under this framework, the current delays in presenting immigration detainees at the Otay and Imperial Regional Detention Facilities to an immigration judge violate due process because (1) the individual's interest in freedom from restraint is paramount; (2) the risk of erroneous detention is significant when an initial appearance is not promptly provided, and a prompt hearing would significantly reduce that risk; and (3) the government has no legitimate interest in delaying first appearance before an immigration judge, and any burdens in ensuring a prompt appearance cannot defeat the right to a prompt hearing given the deprivation of liberty.

**B.    Substantive Due Process Requires Prompt Initial Hearing**

41.    In addition to procedural safeguards, the Due Process Clause contains a substantive component that "protects individuals from arbitrary deprivation of their liberty by government" in a manner that "shocks the conscience." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006).

42.    Substantive due process prohibits an extended detention, without initial appearance, following arrest. *Hayes v. Faulkner County*, 388 F.3d 669, 673 (8th Cir. 2004). In the criminal context, a prompt first appearance "serves to enforce or give meaning to important individual rights that are either expressly granted in the Constitution or are set forth in Supreme Court precedent." *Coleman v. Frantz*, 754 F.2d 719, 724 (7th Cir. 1985). The substantive due process right to prompt presentment extends to the civil detention context, because the detainee "face[s] the same sort of ultimate sanction as if he defended himself from a criminal charge—the loss of liberty."

*Armstrong v. Squadrito*, 152 F.3d 564, 574-5 (7th Cir. 1998) (holding that Indiana's civil "body attachment writ" under which the arrest was made shared characteristics with a criminal warrant). Therefore, in the civil or criminal contexts, "due process simply does not permit the state to detain an arrestee indefinitely without procedural protections." *Id.*

43.    The substantive due process right to prompt presentment also exists in the immigration context. As with other civil detainees, immigration detainees are subjected to the loss of liberty, often in conditions resembling criminal detention. *See Rodriguez v. Robbins*, 804 F.3d 1060, 1073 (9th Cir. 2015) ("Civil immigration detainees are treated much like criminals serving time.").

44.    An unreasonable delay before the initial Master Calendar Hearing (such as the current one to three month delay) violates substantive due process rights of immigration detainees. Courts have held that delays of similar or lesser duration violated substantive due process. *See, e.g.*, *Hayes*, 388 F.3d at 675 (38 days); *Armstrong*, 152 F.3d at 567, 575-76 (57 days); *Coleman*, 754 F.2d at 723 (18 days).

## III.    Fourth Amendment Rights of Detainees

45.    The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." The Fourth Amendment requires a judicial finding of probable cause to justify arrest, either through a warrant issued before arrest or judicial determination within 48 hours of arrest, absent extraordinary circumstances. *See Gerstein v. Pugh,* 420 U.S. 103, 112-3 (1975); *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991).

46.    ICE seeks no prompt determination of probable cause by a judge when it detains individuals beyond 48 hours. Instead, decisions to keep persons in custody beyond 48 hours and before their initial Master Calendar Hearing are made by DHS

officers alone without prompt judicial review.  Thus, ICE's warrantless practices and procedures violate the Fourth Amendment.

## **FACTS**

47.    Plaintiff-Petitioner Jose Orlando Cancino Castellar is eligible for Deferred Action for Childhood Arrivals (DACA), a form of deferred action from removal that would allow him to remain in the United States if granted.  He was taken into DHS custody on February 17, 2017 and has been detained at the Otay Detention Facility since February 18, 2017 without appearance before a judge or a judicial determination of probable cause for his detention.  On February 21, 2017, ICE issued a Notice to Appear and a warrant for his arrest and made a determination that he should not be released on bond or other conditions.  Mr. Cancino Castellar checked a box acknowledging that he wanted an immigration judge to review the custody determination.  Not only has he not seen an immigration judge, but no hearing date has even been set yet for an initial appearance or a bond hearing.

48.    Plaintiff-Petitioner Ana Maria Hernandez Aguas has two U.S. citizen children and is eligible to apply for cancellation of removal.  She was taken into DHS custody on February 7, 2017 and spent about eight days in CBP and ICE custody in Chula Vista and San Luis, Arizona.  She has been detained at the Otay Detention Facility since February 15, 2017 without appearance before a judge or a judicial determination of probable cause for her detention.  She has not yet been provided with a Notice to Appear, an administrative warrant, or documents indicating DHS's custody determination for her, and no date has yet been scheduled for her to appear before a judge for a master calendar hearing.  Her immigration attorney was able to schedule a bond hearing, currently set for March 13, 2017, which was the earliest date the immigration court would provide.

49.    Plaintiff-Petitioner Michael Gonzalez claims he is a U.S. citizen, which DHS disputes.  On November 17, 2016, he presented himself at the San Ysidro Port of

Entry and expressed a fear of persecution in Mexico.  He was taken into custody and transferred to the Otay Detention Facility on November 23, 2016, where he has remained since without appearance before a judge or a judicial determination of probable cause for his detention.  On December 16, 2016, he was given a credible fear interview by an asylum officer, who determined he had a credible fear, signifying he had a significant chance of prevailing on his asylum claim.  On January 5, 2017, he was served with a Notice to Appear.  On January 30, 2017, a notice was issued indicating that his first hearing in immigration court is scheduled for April 5, 2017.

50.    Incarcerated individuals at the Otay and Imperial Regional Detention Facilities have severe restrictions on their liberty.  The allegations below each apply to both facilities, unless specifically indicated.

51.    Detainees must wear color-coded prison uniforms and are generally detained in a "pod" or "unit" of 60-80 other individuals, where they spend most of their day and may not leave without permission.

52.    Detainees are permitted limited "yard" time outside every day.  The "yard" in the Otay Detention Facility is a concrete surface enclosed on four sides by concrete walls at least 20 feet high.  The yard in the Imperial Regional Detention Facility can reach daily temperatures over 100 degrees for four months a year.

53.    Telephone calls from the facility to family or counsel are expensive and require an "account" with the facility.  Conversations can be recorded.

54.    Some detainees may work, but, if they do, they are paid only $1 per day.

55.    Detainees' meals, bed time, and wake-up times are all dictated by facility schedule.

56.    Detainees at the Imperial Regional Detention Facility may receive non-legal visits from family and friends, but such visits are rare because the detention center is so remote.

Case No. _____

57.    Detainees at the Otay Detention Facility may also receive non-legal visits from family and friends, during limited, pre-set time periods.  But a detainee cannot be in the same room with those visitors unless the detainee agrees to endure a strip search before returning to his or her pod.  If the detainee does not agree to be strip searched, then the visit can only be conducted via closed-circuit video.

## CLASS ACTION ALLEGATIONS

### I.    Defendant-Respondents' Policies and Practices for Keeping Detainees in the Southern District of California

58.    On any given day, throughout the Southern District of California, there are dozens, and quite likely hundreds, of individuals who are detained by DHS for weeks or months without final removal orders but have neither seen an immigration judge nor received a judicial determination of probable cause for their confinement.

59.    In the Southern District of California, ICE currently operates two large immigration detention centers where alleged noncitizens are subjected to incarceration: the Otay Detention Facility (located approximately 25 miles southeast of downtown San Diego) and the Imperial Regional Detention Facility (located about 130 miles east of downtown San Diego).  On any given day, about 1,500 individuals are detained at these two facilities, the vast majority of whom are detained pending removal proceedings.[8]

60.    CBP also operates several supposedly "short term" detention centers throughout the Southern District of California.  On information and belief, many detainees who have spent well over 48 hours in the custody of CBP are eventually referred to ICE custody for removal proceedings before an immigration judge.  CBP

---

[8]  The Imperial Regional Detention Facility has a maximum capacity of 704 detainees and operates at or near capacity, with an average daily population of 696 in FY 2016.  On information and belief, the Otay Detention Facility currently has a maximum capacity for 1120 immigration detainees and an average daily population of around 870 immigration detainees in FY 2016, with the remaining detainees in the custody of U.S. Marshals.

detainees are often held virtually incommunicado without proper access to counsel, making it difficult to identify such detainees without discovery.

61.     Authority over removal cases at the Otay and Imperial Regional Detention Facilities currently falls under the San Diego Immigration Court, which is operated, controlled, and supervised by EOIR.

62.     In the Southern District of California, DHS makes decisions to detain alleged noncitizens pending removal proceedings without regard for the corresponding immigration court's ability to commence the cases promptly.

63.     DHS's decision to detain individuals pending removal proceedings occurs without meaningful oversight or prompt judicial review.  There is no judicial finding of probable cause to detain or an immediate and automatic custody review hearing, commonly called a bond hearing.  This practice results in detention centers being flooded with more individuals than the immigration court can reasonably handle and, as such, significantly delays the initial Master Calendar Hearings.

64.     As a general practice in the Southern District of California, DHS fails to provide the time, place and date of the initial Master Calendar Hearing in the Notice to Appear.  Instead, DHS relies on EOIR to schedule the hearing and takes no responsibility for presenting the individuals in its custody to the court promptly.

65.     Despite knowledge of the lengthy delays experienced by detainees before they first appear before an immigration judge, EOIR has not structured or allocated the resources, staffing, scheduling, or operations of the relevant immigration courts to prevent the occurrence of unreasonable delays in scheduling the initial Master Calendar Hearing for individuals in detention.

66.     EOIR is aware that the number of pending cases in FY 2016 at the Imperial Regional Detention Facility was 521, compared to 180 in FY 2011 at its predecessor El Centro Service Processing Center, and the number of pending cases in FY 2016 at the Otay Detention Facility was 607, compared to 142 in FY 2010.

67.    EOIR has not provided a sufficient number of immigration judges or otherwise taken necessary steps to schedule prompt initial hearings for immigration detainees confined in this district, despite knowledge that the number of pending cases for detainees has increased by several hundred percent.

## II.    This Case Meets the Requirements of Federal Rule of Civil Procedure 23

68.    Plaintiff-Petitioners Cancino Castellar, Hernandez Aguas, and Gonzalez bring this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of themselves and all other persons similarly situated. The proposed class is defined as follows:

> All individuals in the Southern District of California, other than those with final removal orders, who are or will be detained by DHS more than 48 hours without a hearing before an immigration judge or judicial review of whether their detention is justified by probable cause.

69.    The proposed class is so numerous and membership in the class so fluid or transitory that joinder of all members is impracticable.  At any given time, at least 1,500 persons are confined in immigration detention facilities in the Southern District of California, and on any given day well over 100 detainees who do not have final removal orders have not yet seen an immigration judge or received judicial review of probable cause within 48 hours of arrest.  More individuals will become class members in the future, as Defendant-Respondents continue to detain additional persons for removal proceedings.

70.    All members of the class are equally subject to Defendant-Respondents' policy and practice that directly results in incarceration of the class members without prompt presentment to a judge or judicial review of probable cause to justify their detention.

71.    Common questions of law or fact exist as to all class members, including but not necessarily limited to the following:

    a.    how long class members are detained before presentment to a judge, and why such delays occur;

b.  how long class members are detained before any judicial review of the question whether probable cause justifies their detention, and why such delays occur;

c.  whether the delays in judicial presentment violate the procedural component of the Due Process Clause of the Fifth Amendment;

d.  whether the delays in judicial presentment violate the substantive component of the Due Process Clause of the Fifth Amendment;

e.  whether failure to provide class members with a prompt judicial review with respect to probable cause violates the Fourth Amendment;

f.  whether the delays in judicial presentment to which class members are subject violate the Administrative Procedure Act; and

g.  whether failure to provide class members with prompt judicial review with respect to probable cause violates the Administrative Procedure Act.

72.    The claims of Plaintiff-Petitioners are typical of the claims of the class as a whole, because both Plaintiff-Petitioners and the class members have been similarly detained without prompt presentment to a judge or judicial review of the question whether probable cause justifies their detention.  Plaintiff-Petitioners and the class members have been directly injured by Defendant-Respondents' policy and practice that results in excessive delays before judicial presentment or review of probable cause.

73.    Plaintiff-Petitioners will fairly and adequately represent the interests of the class.  Plaintiffs-Petitioners have no interests separate from those of the class with respect to the claims and issues in this case and seek no relief other than the relief sought on behalf of the class.  Counsel for Plaintiffs-Petitioners are experienced in complex class action, civil rights, and immigrants' rights litigation.

74.    Defendant-Respondents have acted on grounds generally applicable to the class by failing to ensure prompt judicial presentment or judicial review of probable

cause, thereby making final injunctive and declaratory relief appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of Due Process Clause of the Fifth Amendment
to the United States Constitution**

75.　Plaintiff-Petitioners repeat and reallege all the allegations above and incorporate them by reference here.

76.　The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

77.　The Due Process Clause does not permit the government to detain Plaintiff-Petitioners or other members of the class without promptly presenting them before a judge.

78.　Defendant-Respondents' policies, practices, acts, and omissions violate the procedural component of the Due Process Clause by causing the detention of Plaintiff-Petitioners and the class members without prompt judicial presentment.

79.　Defendant-Respondents' policies, practices, acts, and omissions violate the substantive component of the Due Process Clause by causing the detention of Plaintiff-Petitioners and the class members without prompt judicial presentment.

80.　As a proximate result of Defendant-Respondents' violations of the Due Process Clause, Plaintiff-Petitioners are suffering and will continue to suffer a significant deprivation of their liberty without due process of law.  Plaintiff-Petitioners have no plain, adequate or complete remedy at law to address the wrongs described herein.  The relief sought by Plaintiff-Petitioners is necessary to prevent continued and future irreparable injury.

Case No. _____

## SECOND CLAIM

### Violation of the Fourth Amendment
### to the United States Constitution

81.    Plaintiff-Petitioners repeat and reallege all the allegations above and incorporate them by reference here.

82.    The Fourth Amendment to the U.S. Constitution provides that "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The Fourth Amendment does not permit the government to detain individuals without prompt judicial determination of whether probable cause justifies their detention.

83.    Defendant-Respondents' policies, practices, acts and omissions violate the Fourth Amendment by causing detention of Plaintiff-Petitioners and the class members without prompt judicial determination (by an immigration judge or otherwise) of whether probable cause justifies their detention.

84.    As a proximate result of Defendant-Respondents' violations of the Fourth Amendment, Plaintiff-Petitioners are suffering and will continue to suffer unreasonable seizures in violation of the Constitution. Plaintiff-Petitioners have no plain, adequate or complete remedy at law to address the wrongs described herein. The relief sought by Plaintiff-Petitioners is necessary to prevent continued and future irreparable injury.

## THIRD CLAIM

### Violation of 5 U.S.C. §§ 702, 706(1), (2)(A)-(D)

85.    Plaintiff-Petitioners repeat and reallege all the allegations above and incorporate them by reference here.

86.    The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

87.    The Administrative Procedure Act further provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C §§ 706(1), (2)(A)-(D).

88.    Defendant-Respondents' policies, practices, acts, or omissions as described herein are final agency actions that are (A) arbitrary and capricious, and inconsistent with the purposes and concerns of relevant statutes or laws, (B) contrary to constitutional right, power, privilege or immunity, (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, and/or (D) without observance of procedure required by law, in violation of 5 U.S.C. §§ 702, 706(1), (2)(A)-(D).

89.    As a proximate result of Defendant-Respondents' violations of the Administrative Procedure Act, Plaintiff-Petitioners are suffering and will continue to suffer a significant deprivation of their liberty and denial of the rights, privileges, and procedures afforded them under the Constitution and the INA.  Plaintiff-Petitioners have no plain, adequate or complete remedy at law to address the wrongs described herein.  The relief sought by Plaintiff-Petitioners is necessary to prevent continued and future irreparable injury.

90.    For at least these reasons, Plaintiff-Petitioners have been aggrieved by the Defendant-Respondents under the Administrative Procedures Act.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Petitioners respectfully request that the Court:

a.    Issue an order certifying this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.      Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

c.      Issue a judgment declaring that Defendant-Respondents' policies, practices, acts, and omissions described herein violate the rights of Plaintiff-Petitioners and the class members under the Due Process Clause of the Fifth Amendment to the United States Constitution;

d.      Issue a judgment declaring that Defendant-Respondents' policies, practices, acts, and omissions described herein violate the rights of Plaintiff-Petitioners and the class members under the Fourth Amendment to the United States Constitution;

e.      Issue a judgment declaring that Defendant-Respondents' policies, practices, acts, and omissions described herein as applied to Plaintiff-Petitioners and the class members violate the Administrative Procedure Act;

f.      Permanently enjoin Defendant-Respondents, their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of the foregoing persons from engaging in the unlawful policies, practices, acts, and omissions causing the violations of law described herein and order such relief as necessary to cure such violations;

g.      Issue a writ of habeas corpus commanding the release of Plaintiff-Petitioners and the class members from detention to the extent necessary for Defendant-Respondents to comply with their constitutional and statutory obligations as described herein;

h.      Grant Plaintiff-Petitioners their reasonable attorney fees and expenses pursuant to 28 U.S.C. § 2412, and other applicable law; and

i.      Grant such other relief as this Court deems just and proper.

1    Dated:  March 9, 2017

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ACLU FOUNDATION OF SAN DIEGO
& IMPERIAL COUNTIES


By:  S/ Bardis Vakili
     BARDIS VAKILI

     Attorney for Plaintiff-Petitioners
     Email: bvakili@aclusandiego.org