# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ORLANDO CANCINO CASTELLAR; ANA MARIA HERNANDEZ AGUAS; MICHAEL GONZALEZ, | Case No. 17-cv-0491-BAS-BGS |
| Plaintiff-Petitioners, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT-RESPONDENTS' RENEWED MOTION TO DISMISS THE COMPLAINT-PETITION** |
| v. | |
| KEVIN MCALEENAN, Acting Secretary, U.S. Department of Homeland Security, *et al.*, | **[ECF No. 60]** |
| Defendant-Respondents. | |

This case presents the question whether the Fifth Amendment Due Process Clause requires certain protections for noncitizens detained by the Government pending removal proceedings. On behalf of themselves and a putative class of noncitizens detained in the Southern District of California, Plaintiff-Petitioners Jose Orlando Cancino Castellar, Ana Maria Hernandez Aguas, and Michael Gonzalez (the "Plaintiff-Petitioners") claim that the Due Process Clause requires prompt presentment to an immigration judge after the Government takes an alleged noncitizen into custody. Defendant-Respondents[1]—various federal immigration

---

[1] The Complaint-Petition names the following Defendant-Respondents in their official capacity: John F. Kelly, Secretary of the U.S. Department of Homeland Security ("DHS"); Thomas Homan, Acting Director of U.S. Immigration and

officials who oversee immigration enforcement nationally and locally in the Southern District of California—allegedly have a policy and practice of delaying for one to three months the presentment of detained noncitizens to an immigration judge, which Plaintiff-Petitioners contend renders their detention unreasonably prolonged. Plaintiff-Petitioners allege that Defendant-Respondents' policy impedes Plaintiff-Petitioners' access to a panoply of statutorily and regulatory-required features and rights that attend a noncitizen's initial hearing before an immigration judge, and further impedes the ability for certain noncitizens to request a bond hearing.

Following reconsideration of its prior dismissal of this case for lack of subject matter jurisdiction, the Court reinstated Plaintiff-Petitioners' claims that Defendant-Respondents' alleged policy violates the substantive and procedural components of the Fifth Amendment Due Process Clause and various provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), 706(2)(A)–(D).  *See Cancino Castellar v. Nielsen*, 338 F. Supp. 3d 1107, 1117–18 (S.D. Cal. 2018).

---

Customs Enforcement ("ICE"); Kevin K. McAleenan, Acting Commissioner of U.S. Customs and Border Protection ("CBP"); Gregory Archambeault, Field Office Director for the San Diego Field Office of ICE; Jefferson B. Sessions III, Attorney General of the United States; and Juan P. Osuna, Director of the Executive Office for Immigration Review ("EOIR").  (ECF No. 1 ¶¶ 12–17.)  In the time since the Complaint-Petition's filing in March 2017, many of the named Defendant-Respondents no longer occupy their respective positions.  The Court has previously substituted Elaine Duke as the Acting Secretary of DHS (ECF No. 40), and Kirstjen Nielsen as the Secretary of DHS (ECF No. 43).

Pursuant to Federal Rule of Civil Procedure Rule 25(d), the Court now makes the following substitutions to the named Defendant-Respondents: (1) Kevin K. McAleenan is substituted as the Acting Secretary of DHS; (2) Mark A. Morgan is substituted as the Acting Director of ICE; (3) John P. Sanders is substituted as the Acting Commissioner of CBP; and, finally, (4) William P. Barr is substituted as the Attorney General of the United States.  Defendant-Respondents are ordered to file notices of substitution with the Court for any further changes in the named Defendant-Respondents within a reasonable time period after such change occurs.

Defendant-Respondents have renewed their Rule 12(b)(6) motion to dismiss Plaintiff-Petitioners' Fifth Amendment and corresponding APA claims. (ECF Nos. 60, 62.) Plaintiff-Petitioners oppose. (ECF No. 61.) For the reasons herein, the Court grants in part and denies in part Defendant-Respondents' motion.

## BACKGROUND

### A.    Relevant Statutes and Regulations

The Court previously discussed the relevant statutory and regulatory framework in this case in the Court's initial jurisdictional analysis. (ECF No. 49 at 3–6.) Because the claims subject to review have changed as a result of the Court's reconsideration order and in the interest of completeness of the Court's Rule 12(b)(6) analysis, the Court once more sets forth the relevant statutory and regulatory framework.

### 1.    Initial Custody Determination Pending Removal Hearing

Section 1357 of the Immigration and Nationality Act ("INA") requires that an alien arrested without a warrant "shall be taken without unnecessary delay . . . before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States." 8 U.S.C. § 1357(a)(2). In accordance with this statutory directive, by regulation, "an alien arrested without a warrant . . . will be examined by an officer other than the arresting officer" but "the arresting officer" may conduct the examination "if taking the alien before another officer would entail unnecessary delay." 8 C.F.R. § 287.3(a). If the examining officer is satisfied that there is "prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws," the officer must refer the case to an immigration judge for further inquiry, or take any action that may be appropriate or required under applicable law and regulations. 8 C.F.R. § 287.3(b).

By regulation, the examining officer also decides whether the alien will remain in custody.  Unless voluntary departure has been granted and in the absence of "an emergency or other extraordinary circumstances" requiring "an additional reasonable period of time," "a determination will be made within 48 hours of the arrest . . . whether the alien will be continued in custody or released on bond or recognizance" subject to the standards for release established by 8 C.F.R. part 236.  8 C.F.R. § 287.3(d).  For an alien who is eligible for release, the "alien must demonstrate to the satisfaction of the officer that [his or her] release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."  8 C.F.R. §§ 236.1, 1236.1.  The examining officer determines whether a notice to appear ("NTA") and warrant of arrest will be issued under the standards set forth in 8 C.F.R. part 239.  8 C.F.R. § 287.3(d). DHS regulations authorize an immigration officer to formally arrest and take the alien into custody pursuant to a Form I-200 Warrant of Arrest at the time an NTA is issued.  8 C.F.R. § 236.1(b); *see also* 8 C.F.R. § 1236.1(b) (same).

Except for an alien subject to expedited removal, the examining officer must advise an alien who was arrested without a warrant and who is placed in Section 240 removal proceedings about the reasons for his or her arrest and "the right to representation at no expense to the Government."  8 C.F.R. § 287.3(c).  The officer must provide a list of "the available free legal services" available "in the district where the hearing will be held" and the officer "shall note on Form I-862 that such a list was provided to the alien."  *Id*.  Finally, the officer advises the alien that any statement the alien makes may be used against him or her in a subsequent proceeding. *Id*.

**2.      Commencement of Removal Proceedings**

With certain exceptions, including for an alien subject to expedited removal,

removal proceedings under Section 240 of the INA are the "sole and exclusive procedure" to determine whether an alien is removable from the United States. 8 U.S.C. § 1229a(a)(3). A Section 240 removal proceeding commences when an immigration officer files an NTA against an alien with the immigration court, an entity which is part of the Executive Office for Immigration Review ("EOIR"). 8 C.F.R. § 1239.1(a); *see also* 8 C.F.R. § 1003.14.

As a general matter, "[t]he Immigration Court shall be responsible for scheduling cases and providing notice to the government and the alien of the time, place, and date of hearings." 8 C.F.R. § 1003.18(a). Notwithstanding this general rule, immigration officers "shall provide in the [NTA], the time, place and date of the initial removal hearing, where practicable." 8 C.F.R. § 1003.18(b). If this information is not contained in the NTA, the immigration court has responsibility for providing the government and the alien notice of the time, place, and date of the initial removal hearing. *Id.* The immigration court is otherwise responsible for scheduling removal hearings. 8 C.F.R. § 1003.18(a). By statute, the INA requires that "in order that an alien be permitted the opportunity to secure counsel before the first hearing date in proceedings . . ., the hearing date shall not be scheduled earlier than 10 days after service of the [NTA], unless the alien requests in writing an earlier hearing date." 8 U.S.C. § 1229(b)(1).

The initial Master Calendar Hearing ("MCH") is the "initial hearing in removal proceedings" and is "the first time a neutral adjudicator (the immigration judge) explains" certain aspects of removal proceedings. (ECF No. 1, Complaint-Petition ("Compl.-Pet.") ¶¶ 25, 29–30.) At the initial MCH, the immigration judge "explains the nature of the removal proceeding, the contents of the [NTA] 'in non-technical language,' an alien's right to representation at his or her own expense, and the availability of pro bono legal services." (*Id.* ¶ 29 (citing 8 C.F.R. § 1240.10(a)).)

The hearing provides an opportunity for the immigration judge to verify service of the NTA, provide the NTA if service was not made, and examine the NTA for and demand correction of any defects. (*Id.* ¶ 30 (citing IJ Benchbook, Introduction to the Master Calendar 3).) The immigration judge may identify several forms of relief from removability for which the alien may be eligible. (*Id.* ¶ 32.) The immigration judge does all of this in the native language of the alien through an interpreter. (*Id.* ¶ 29 (citing Immigration Court Practice Manual, Chapter 4.15(f).) The initial MCH also provides an immigration judge the "first opportunity to speak with and observe aliens who may be eligible for appointed counsel as a result of incapacity due to mental health." (*Id.* ¶ 34.)

"[A]t the initial [MCH], unrepresented detainees who do not speak or write English may, for the first time, request a bond hearing with the aid of an interpreter in their native language." (*Id.* ¶ 31 (citing 8 C.F.R. §§ 1003.19(b), (c)).) Following such a request, the immigration judge must schedule the bond hearing at "the earliest possible date." (*Id.* (quoting Immigration Court Practice Manual, Chapter 9.3(d).) For detained aliens who DHS asserts are ineligible for bond hearings because they are subject to mandatory detention, the initial MCH provides an opportunity to challenge that mandatory detention. (*Id.* (citing *In re Joseph*, 22 I. & N. Dec. 799, 800 (BIA 1999)).) By regulation, custody redetermination proceedings before an immigration judge are "separate" from removal proceedings. 8 C.F.R. §§ 1003.19, 1236.1.

## B.    Factual Allegations

Plaintiff-Petitioners challenge what they allege is "Defendant-Respondents' policy and practice of detaining individuals for extended periods of time without promptly presenting them for an initial hearing before an immigration judge[.]" (Compl.-Pet. ¶¶ 1, 58.) The alleged policy of delayed presentment entails continued

detention "for weeks or months"—most concretely "one to three months"—before presentment to an immigration judge. (*Id.* ¶¶ 5, 58.) Implementation of this policy is allegedly shared by DHS and its components, ICE and CBP, and EOIR—entities over which the named Defendant-Respondents possess authority.

DHS allegedly detains around 1,500 noncitizens in the Southern District of California on any given day, "the vast majority of whom are detained pending removal proceedings." (*Id.* ¶ 59.) ICE allegedly operates two immigration detention centers in the District: the Otay Mesa Detention Facility ("Otay") and the Imperial Regional Detention Facility ("Imperial"). (*Id.* ¶¶ 5, 58.) Individuals detained at Otay and Imperial allegedly face "severe restrictions on liberty," including having to "wear color-coded prison uniforms" and being placed in detention in pods or units of 60 to 80 other individuals "where they spend most of their day and may not leave without permission." (*Id.* ¶ 51.) CBP allegedly operates several additional "short term" detention centers and keeps in custody beyond 48 hours noncitizens who are referred to ICE custody and placed into removal proceedings. (*Id.* ¶¶ 5, 60.) "CBP detainees" are allegedly "held virtually incommunicado without proper access to counsel," and are ultimately referred to ICE custody. (*Id.* ¶ 60.)

DHS "detains individuals allegedly subject to removal without regard for the immigration court's ability to commence and process the cases promptly" and without an "automatic custody review hearing, commonly called a bond hearing." (*Id.* ¶¶ 6, 62–63.) DHS's alleged practice "results in detention centers being flooded with more individuals than the immigration court can reasonably handle and, as such, significantly delays the initial [MCHs]." (*Id.* ¶ 63.) "As a general practice," DHS allegedly fails to provide the time, place and date of the initial MCH in an NTA, instead relying on EOIR to schedule the hearing. (*Id.* ¶ 64.)

EOIR in turns operates, controls and supervises the San Diego Immigration Court, which has authority over removal proceedings for noncitizens detained at Otay and Imperial. (*Id.* ¶ 61.) Plaintiff-Petitioners allege that EOIR is "made aware" whether a case involves a detained individual when an NTA is filed. (*Id.* ¶ 28.) Although EOIR "puts the case on the immigration court's detained docket, which is more expedited than its non-detained docket," "EOIR does not schedule more expeditious initial [MCHs] for detainees than it does for subsequent [MCHs] for detainees." (*Id.*) As a result, "EOIR frequently sets the initial [MCH] for detained immigration cases in the [District] for one to three months after receiving the [NTA]." (*Id.*) Plaintiffs further allege that EOIR has not taken steps to schedule prompt initial hearings for immigrants in custody "despite knowledge that the number of pending cases for detainees has increased by several hundred percent." (*Id.* ¶¶ 65, 67.)

Each Plaintiff-Petitioner alleges that he or she experienced this alleged policy and practice before and up to the time of the Complaint-Petition's filing on March 9, 2017.[2] For example, Plaintiff-Petitioner Jose Orlando Cancino Castellar ("Cancino") alleges that he was taken into DHS custody on February 17, 2017, and his detention at Otay began the next day. (*Id.* ¶ 47.) On February 21, 2017, an ICE officer issued an NTA against Cancino, executed an arrest warrant, and determined that Cancino should remain in custody; Cancino requested an immigration judge custody

---

[2] The Court's first dismissal order provided additional facts regarding the circumstances of Plaintiff-Petitioners' alleged detention and delayed presentment to an immigration judge. The Court considered these additional facts set forth in evidentiary submissions provided by Defendant-Respondents in the context of a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. Because the present motion to dismiss is under Rule 12(b)(6), the Court's assessment is limited to the Complaint-Petition's allegations. *See Lee v. City of L.A.*, 250 F.3d 668, 688–89 (9th Cir. 2001). Accordingly, the Court disregards Defendant-Respondents' references to any record evidence submitted in connection with their prior motion to dismiss that does not appear in the Complaint-Petition. (*See* ECF No. 60-1 at 8–11.)

redetermination. (*Id.*) At the time of the Complaint-Petition's filing, Cancino had not seen an immigration judge and no hearing date was set. (*Id.*) Plaintiff-Petitioner Ana Maria Hernandez Aguas ("Hernandez") alleges that DHS initially took her into custody on February 7, 2017 and her detention at Otay began on February 15, 2017. (*Id.* ¶ 48.) At the time of the Complaint-Petition's filing, Hernandez had been detained at Otay "without appearance before a judge" and she had not been provided with an NTA, documents indicating DHS's custody determination for her, and no date was scheduled for her "to appear before a judge for a master calendar hearing." (*Id.*) Her attorney had requested a bond hearing that was then set for March 13, 2017. (*Id.*) Plaintiff-Petitioner Michael Gonzalez alleges that he presented himself at the San Ysidro Port of Entry on November 17, 2016, expressed a fear of persecution in Mexico, and was taken into custody. (*Id.* ¶ 49.) At the time of the Complaint-Petition's filing, Gonzalez alleged that he had been detained at Otay since November 23, 2016 "without appearance before a judge." (*Id.*) Following an asylum officer's credible fear determination, Gonzalez was served with an NTA on January 5, 2017, which indicated "that his first hearing in immigration court is scheduled for April 5, 2017." (*Id.*)

Plaintiff-Petitioners claim that "the current delays in presenting detainees at the Otay and Imperial Regional Detention Facilities to an immigration judge" infringe the substantive and procedural due process rights of the Plaintiff-Petitioners and putative class members. (*Id.* ¶¶ 38–40, 75–78 (procedural due process); *id.* ¶¶ 41–44, 75–77, 79 (substantive due process).) Plaintiff-Petitioners also assert claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(1), 706(2)(A)–(D). (Compl.-Pet. ¶¶ 85–90.) Plaintiff-Petitioners seek to represent a class of "[a]ll individuals in the Southern District of California, other than those with final orders of removal, who are or will be detained by DHS more than 48 hours without a hearing before an immigration judge[.]" (*Id.* ¶ 68.) Plaintiff-Petitioners request "declaratory,

injective, and habeas corpus relief that will prevent Defendant-Respondents from detaining individuals for an unreasonable period before presentment to a judge[.]" (*Id.* ¶ 8; Prayer for Relief.)

## C. Procedural History

Plaintiff-Petitioners originally filed the Complaint-Petition on March 9, 2017 (ECF No. 1) and filed a motion for class certification the next day (ECF No. 2). As originally filed, the Complaint-Petition raised claims under the Fourth and Fifth Amendments and the APA. Defendant-Respondents moved to dismiss the Complaint-Petition under Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. (ECF No. 28.) The Court granted Defendants-Respondents' Rule 12(b)(1) motion primarily on the ground that applicable Ninth Circuit precedent showed that 8 U.S.C. § 1252(a)(5) and 8 U.S.C. § 1252(b)(9) channeled jurisdiction over Plaintiff-Petitioners' claims to the Court of Appeals in a petition for review, therefore precluding jurisdiction in this Court. (ECF No. 49 at 20–37.) Because of this jurisdictional conclusion, the Court did not assess Defendant-Respondents' Rule 12(b)(6) dismissal arguments. The Court terminated as moot Plaintiff-Petitioners' then-pending motion for class certification and granted Plaintiff-Petitioners leave to amend "to assert claims over which this Court may properly exercise jurisdiction." (*Id.* at 42.)

Some three weeks after the Court's order, the Supreme Court issued its decision in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). The case involved noncitizens detained during the pendency of immigration proceedings for more than six months without a bond hearing pursuant to general immigration detention statutes. The *Jennings* respondents asserted constitutional and statutory claims that individual bond hearings were required to justify their continued detention consistent

with the Fifth Amendment Due Process Clause.  *Id.* at 838–39.[3]  *Jennings* addressed, in relevant part, the scope of 8 U.S.C. § 1252(b)(9)—one of the key jurisdictional provisions on which this Court decided the parties' jurisdictional dispute in this case—and expressly determined that the provision did not bar jurisdiction over the respondents' claims.  *Id.* at 839–41 (Alito, J., plurality); *see also id.* 882 (Breyer, J., dissenting).

Relying on *Jennings*, Plaintiff-Petitioners requested that the Court reconsider its dismissal for lack of jurisdiction under 8 U.S.C § 1252(a)(5) and § 1252(b)(9). (ECF No. 50.)  The Court granted in part and denied in part Plaintiff-Petitioners' motion, finding that the relevant jurisdictional provision, as interpreted in *Jennings*, precluded jurisdiction in this Court over Plaintiff-Petitioners' Fourth Amendment claim, but did not preclude jurisdiction over their Fifth Amendment due process and corresponding APA claims.  *See Cancino Castellar v. Nielsen*, 338 F. Supp. 3d 1107 (S.D. Cal. 2018).  The Court now turns to the merits of Defendant-Respondents' motion to dismiss Plaintiff-Petitioners' reinstated claims.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting

---

[3] The *Jennings* respondents expressly argued in their complaint that certain statutory provisions that authorize the government to detain noncitizens during removal proceedings, specifically 8 U.S.C. §§ 1225(b), 1226(a), and 1226(c), "do not authorize 'prolonged' detention in the absence of an individualized bond hearing at which the Government proves by clear and convincing evidence that the class member's detention remains justified." *Jennings*, 138 S. Ct. at 839.  Unlike the *Jennings* respondents, Plaintiff-Petitioners do not refer to any of the immigration detention statutes in the Complaint-Petition.

*Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A defendant may move to dismiss a complaint on the ground that its allegations fail to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b).

A Rule 12(b)(6) motion tests the sufficiency of a complaint's allegations. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). To survive a Rule 12(b)(6) motion, a plaintiff is required to set forth "enough facts to state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Factual allegations must be enough to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 556. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). In assessing the sufficiency of a complaint, a court accepts as true the complaint's factual allegations and construes them in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). Yet, the court need not accept as true legal conclusions pled in the guise of factual allegations. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994). A pleading is insufficient if it offers only "labels and conclusion" or "a formulaic recitation of the elements of a cause of action," without adequate factual allegations. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 676.

## DISCUSSION

### A.     Fifth Amendment Due Process Claims

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. "The base requirement of the Due Process Clause is that a person" deprived of a protected

interest "be given an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist*., 149 F.3d 971, 984 (9th Cir. 1998) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). "[N]o process is due if one is not deprived of 'life, liberty, or property.'" *Kerry v. Din*, 135 S. Ct. 2128, 2132 (2015) (Scalia, J., plurality opinion).

The Due Process Clause contains both a substantive and a procedural component. *United States v. Salerno*, 481 U.S. 739, 746 (1987). Substantive due process "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993); *see also Daniels v. Williams*, 474 U.S. 327, 331 (1986) (explaining that substantive due process will "bar certain government actions regardless of the fairness of the procedures used to implement them."). Procedural due process "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause." *Mathews v. Eldridge*, 424 U.S. 319, 322 (1976). Procedural due process does not forbid the government from depriving individuals of a protected interest, but rather requires the government to employ adequate procedures that ensure the fairness of any deprivation. *See McNabb v. United States*, 318 U.S. 332, 347 (1943).

At the heart of this case is Plaintiff-Petitioners' contention that "[t]he Due Process Clause does not permit the government to detain Plaintiff-Petitioners or other members of the [putative] class without promptly presenting them before a judge" as a matter of both substantive and procedural due process. (Compl.-Pet. ¶¶ 77–79.) The Court considers Defendant-Respondents' motion to dismiss both Plaintiff-Petitioners' substantive due process and procedural due process claims.

### 1.   Substantive Due Process Claims

Substantive due process analysis entails two elements.  First, "[a]s a threshold matter, 'to establish a substantive due process claim a plaintiff must show a government deprivation of life, liberty, or property.'"  *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 948 (9th Cir. 2004) (punctuation omitted) (quoting *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998)); *see also Vargas v. City of Philadelphia*, 783 F.3d 962, 973 (3d Cir. 2015).  Second, whether substantive due process is violated turns on the nature of the challenged government conduct.  "[P]laintiffs must allege conduct that 'shock[s] the conscience and offend[s] the community's sense of fair play and decency.'"  *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518 (9th Cir. 2018) (quoting *Sylvia Landfield Tr. v. City of Los Angeles*, 729 F.3d 1189, 1195 (9th Cir. 2013)).  Any "shock the conscience" analysis necessarily requires consideration of the justification the government offers, if any, for the alleged infringement.  *See Reno*, 507 U.S. at 301–02.  The Court considers each here.

#### a.   Plaintiff-Petitioners' Liberty Interest and Asserted Right

As a threshold matter, Plaintiff-Petitioners have identified a liberty interest implicating the Due Process Clause.  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects."  *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).  Having identified that there is a relevant liberty interest in this case, however, does not end the Court's inquiry because Plaintiff-Petitioners anchor their claim in an asserted substantive due process right.

"'Substantive due process' analysis must begin with a careful description of the asserted right[.]"  *Reno*, 507 U.S. at 302.  At a general level, Plaintiff-Petitioners

claim that "[s]ubstantive due process prohibits an extended detention, without initial appearance, following arrest." (Compl.-Pet. ¶ 42.) More directly, Plaintiff-Petitioners claim that the "right to prompt presentment *also exists in the immigration context*" such that "[a]n unreasonable delay before the initial Master Calendar Hearing (such as the current one to three-month delay) violates substantive due process rights of immigration detainees." (*Id.* ¶¶ 43–44 (emphasis added).) To be clear, the term "presentment" is used interchangeably with "first appearance" or "initial appearance."

In assessing a substantive due process claim, a court must keep in mind the traditional "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). "The 'shock the conscience' standard, fuzzy under the best of circumstances, becomes fuzzy beyond a court's power to interpret objectively where there is a dearth of previous decisions on which to base the standard." *Braley v. City of Pontiac*, 906 F.2d 220, 225 (6th Cir. 1990). The Supreme Court has therefore cautioned that "the mere novelty of . . . a claim is reason enough to doubt that 'substantive due process' sustains it[.]" *Reno*, 507 U.S. at 303. Here, although Plaintiff-Petitioners do not identify a single case in which a federal court has acknowledged a right to prompt presentment in an immigration detention case, Plaintiff-Petitioners draw from an ample line of authorities that recognize the importance of presentment for persons detained by the government.

The roots of the presentment requirement on which Plaintiff-Petitioners' claims are premised are deep. "The common law obliged an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could. This 'presentment' requirement tended to prevent secret detention and served to inform a suspect of the

charges against him, and it was the law in nearly every American State and the National Government." *Corley v. United States*, 556 U.S. 303, 306 (2009) (citations omitted). And in the federal criminal context, "the common law right . . . was subsequently codified in a number of federal statutes." *United States v. Garcia-Hernandez*, 569 F.3d 1100, 1104 (9th Cir. 2009).

Beyond these roots, the significance of the rule regarding prompt presentment to the recognition of a substantive due process right is clear in the criminal context. For example, in *Coleman v. Frantz*, 754 F.2d 719 (7th Cir. 1985), the plaintiff filed a Section 1983 action against an Indiana county sheriff related to the plaintiff's 18-day detention following his arrest on a criminal bench warrant supported by probable cause. The Seventh Circuit observed that, at the time of its decision, "the issue of an arrestee's right to a prompt first appearance before a judicial officer [wa]s largely one of first impression." *Id*. at 723. Yet, the Seventh Circuit held "that the plaintiff's eighteen-day detention without an appearance before a judge or magistrate was a deprivation of liberty without due process of law." *Id*.

To arrive at its conclusion that the Due Process Clause placed a substantive limitation on the plaintiff's 18-day detention without presentment, the *Coleman* court first noted that the Supreme Court had found that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to an "extended restraint of liberty following arrest." *Id*. (citing *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)). The *Coleman* court then observed that in *Baker v. McCollan*, 443 U.S. 137 (1979), the Supreme Court "reiterated its concern with 'extended restraints on liberty following arrest,'" and, in part, "appl[ied] a due process standard" to alternatively hold "that a three-day detention over a New Year's weekend did not amount to a deprivation of liberty without due process of law." *Coleman*, 754 F.2d at 724. Finding "no reason why prolonged detentions of this sort should be exempt from

scrutiny under the requirements of due process," the *Coleman* court recognized that the Fourteenth Amendment Due Process Clause applied. *Id.* To ground its due process analysis, the *Coleman* court first distilled from *Baker* the principle that "the duration of the detention and the burden placed on state officials in providing procedural safeguards are highly relevant to a constitutional examination of post-arrest detentions." *Id.* The *Coleman* court expressly noted that "[w]here first appearances are provided, the requirement that they be timely would place a relatively small burden on law enforcement and judicial officers." *Id.* Faced with "unexplained factors" concerning the plaintiff's 18-day detention, the Seventh Circuit concluded that the "plaintiff's 18-day detention was a violation of liberty without due process of law." *Id.*

The *Coleman* court further elaborated on why the inexplicable failure to present the plaintiff for an initial appearance during his detention violated due process. The court observed that "[a]lmost every element of a 'first appearance' under state statutes or the Federal Rules of Criminal Procedure serves to enforce or give meaning to important individual rights that are either expressly granted in the Constitution or are set forth in Supreme Court precedent[,]" including rights to (1) "inform the suspect of the charge—Sixth Amendment," (2) "inform the defendant of the right to counsel and determine if the defendant is indigent and desires the assistance of appointed counsel—Sixth Amendment," (3) "inform the suspect of the right to remain silent under the privilege of self-incrimination—Fifth Amendment," and (4) "set or review bail—Eighth Amendment." *Id.* Thus, the *Coleman* court concluded that, regardless of whether these rights were specifically violated, "[a]n extended detention before a first appearance, whether or not there has been a valid determination of probable cause, substantially impinges upon and threatens all of these rights." *Id.*

Of course, Plaintiff-Petitioners here assert a substantive due process right to presentment in the context of detention incidental to a proceeding that is treated as civil. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country[.]"). The Seventh Circuit squarely addressed whether a substantive due process right to prompt presentment exists for civil detainees in *Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998).

In *Armstrong*, the plaintiff was detained for 57 days pursuant to a civil "body attachment warrant" issued because the plaintiff had failed to appear for a court hearing regarding child support arrearages. *Id.* at 567. The plaintiff remained detained despite his "repeated inquiries" and, after his release, filed a Section 1983 suit against the sheriff, jail commander and several guards. *Id.* Confronted with the plaintiff's substantive due process claim, the *Armstrong* court noted that *Coleman* and various other decisions all "strengthen[ed] the argument that prolonged detention offends due process," but "[p]roblematically . . . . the plaintiffs [in those cases] all faced arrest and detention for criminal charges." *Id.* at 573.

However, the *Armstrong* court ultimately found the criminal-civil difference to be immaterial by expressly noting that the civil body attachment warrant in that case, when viewed in relation to "Indiana's indirect contempt statutes" "share[d] certain attributes with its criminal cousin," "closely resemble[d] a criminal indictment," and "allow[ed] the court to 'punish' the contemnor." *Id.* at 575. The *Armstrong* court further noted that "the Indiana courts have interpreted the [contempt] law to provide the sort of due process protections normally associated with a criminal proceeding." *Id.* Observing that the state law procedures at issue did not implicate "the protections of the Fifth, Sixth, and Eighth Amendments," the *Armstrong* court nevertheless concluded that "the procedural requirements for

contempt are extensive and intimately concern such traditional due process concepts as notice and opportunity to be heard" and presented the "same sort of ultimate sanction as if [the plaintiff] defended himself from a criminal charge—the loss of liberty." *Id*. Thus, the *Armstrong* court determined that "the detention of Armstrong for anything more than a brief time preceding his appearance in court represents an affront to substantive due process." *Id.* at 576.

In line with *Coleman* and *Armstrong*, the Eighth Circuit recognized the right to a prompt first appearance in *Hayes v. Faulkner County*, 388 F.3d 669 (8th Cir. 2004). *Hayes* involved a plaintiff who was arrested and detained for 38 days after the plaintiff failed to appear at a municipal court hearing concerning tickets the plaintiff was issued for lacking automobile tags and vehicle insurance. *Id.* at 672. The *Hayes* court determined that "the Due Process Clause forbids an extended detention, without first appearance, following arrest by warrant." *Id*. at 673.

In the face of Plaintiff-Petitioners' express reliance on these authorities in the Complaint-Petition (Compl.–Pet. ¶¶ 2 37, 42, 44), Defendant-Respondents do not dispute there is a recognized substantive due process right to prompt presentment following arrest that protects both criminal and civil detainees.[4] Rather, Defendant-

_____

[4] Defendant-Respondents argue in reply that Plaintiff-Petitioners "attempt to recharacterize what is plainly a challenge to the procedural protections available to immigration detainees as a substantive due process case." (ECF No. 62 at 8.) To the extent Defendant-Respondents argue for dismissal of Plaintiff-Petitioners' substantive due process claims on this basis, the Court rejects the argument. For one, a claimed due process safeguard may be analyzed under both substantive and procedural due process. *Compare Reno*, 507 U.S. at 301–06 (analyzing substantive due process claim) *with id.* at 306–09 (analyzing procedural due process claim). Second, *Coleman*, *Armstrong*, and *Hayes* all describe the right to prompt presentment as a substantive due process limitation on detention without a prompt first appearance, and the substantive due process analysis they employ is different from the familiar *Mathews v. Eldridge*, 424 U.S. 319 (1976), test that guides judicial

Respondents dispute that a substantive due process right to prompt presentment applies to alleged noncitizens in civil immigration detention pending removal proceedings. (ECF No. 60-1 at 19–21; ECF No. 62 at 8–10.) Defendant-Respondents contend that "the full trappings of legal protections that are accorded to criminal defendants are not necessarily constitutionally required" in removal proceedings because such proceedings "are without doubt civil proceedings[.]" (ECF No. 60-1 at 19 (quoting *Dor v. I.N.S.*, 891 F.2d 997, 1003 (2d Cir. 1989)). And Defendant-Respondents aver that "no federal court has ever extended" the recognized substantive due process right to persons in civil immigration detention, rendering Plaintiff-Petitioners' substantive due process claims a "mere novelty" that should alone warrant dismissal. (ECF No. 60-1 at 19–20.)[5]

It is true that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States (Arizona II)*, 567 U.S. 387, 394 (2012). This power has been recognized as "plenary." *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972). As Defendant-Respondents underscore, it has been said that "in the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976); *see also Fiallo v. Bell*, 430 U.S. 787, 792 (1977). And the Supreme Court has

---

analysis of procedural due process claims. Accordingly, the Court does not find anything improper in Plaintiff-Petitioners' pleading of substantive and procedural due process claims.

[5] Defendant-Respondents further contend that Plaintiff-Petitioners seek to "creat[e] a new constitutional right" guaranteeing "all aliens a hearing before an immigration judge within a specific, judicially-determined timeframe." (ECF No. 60-1 at 20.) Defendant-Respondents' argument rewrites the Complaint-Petition. Plaintiff-Petitioners' claims are expressly limited to persons detained by the government and, even more narrowly, only such persons who are allegedly subjected to Defendant-Respondents' alleged policy in the Southern District of California.

recognized that immigration detention during removal proceedings and for a period of time following a final order of removal is a constitutionally permissible exercise of this power. *See Demore v. Kim*, 538 U.S. 510, 531 (2003) (finding that "limited period" of detention during removal proceedings for an alien who conceded deportability and who was detained under 8 U.S.C. § 1226(c)—a statute governing detention of "deportable criminal aliens"—was constitutionally permissible); *Zadvydas*, 533 U.S. at 691–92 (finding "potentially permanent" detention to raise serious questions, yet suggesting that brief periods of detention might be constitutionally permissible); *Wong Wing v. United States*, 163 U.S. 228, 235 (1896).

But recognition of the government's "plenary" power over immigration and the permissibility of the government's related authority to detain noncitizens in removal proceedings does not compel dismissal of Plaintiff-Petitioners' due process claims. "[T]hat plenary power is subject to constitutional limitations." *Zadvydas*, 533 U.S. at 695 (citing *INS v. Chadha*, 462 U.S. 919, 941–42 (1983); *The Chinese Exclusion Case*, 130 U.S. 581, 604 (1889)). In particular, "the Due Process Clause stands as a significant constraint on the manner in which the political branches may exercise their plenary authority." *Hernandez v. Sessions*, 872 F.3d 976, 990 n.17 (9th Cir. 2017) (citing *Zadvydas*, 533 U.S. at 695). And "[i]n the context of immigration detention, it is well-settled that 'due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Id.* at 990 (quoting *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011)).

Defendant-Respondents' attempt to distinguish the case law recognizing a substantive due process right to prompt presentment is unavailing. (ECF No. 62 at 9.) "Criminal detention cases provide useful guidance in determining what process is due non-citizens in immigration detention." *Hernandez*, 872 F.3d at 993 (citing

*Zadvydas*, 533 U.S. at 690–91). This is because "[i]mmigration cases . . . are set 'apart from mine run civil actions' and 'involve the awesome authority of the State' to take a 'devastatingly adverse action'—here, the power to remove individuals from their homes, separate them from their families, and deport them to countries they may have last seen many years ago." *Id.* (citations omitted).

It is indisputable that removal proceedings are not typical civil proceedings. The "ultimate sanction" in removal proceedings—an order of removal from the United States—while "not, in a strict sense, a criminal sanction," is "a particularly severe 'penalty.'" *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010). In the shadow of this "severe penalty" are a number of statutory and regulatory features and rights in removal proceedings that bear a striking resemblance to those in criminal proceedings. Noncitizens placed into general removal proceedings are entitled to retain counsel, receive notice of the charges of removability, have a hearing, and present a defense, cross-examine witnesses, and compel production of documents and witnesses. *See* 8 U.S.C. § 1229a(b)(4)(A); 8 U.S.C. § 1229a(b)(4)(B); 8 U.S.C. § 1392; 8 C.F.R. § 1240.10(a). This case also involves another aspect of removal proceedings that renders them fundamentally atypical of other civil proceedings: detention. Congress has authorized the government to detain certain noncitizens pending removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(IV); 8 U.S.C. § 1225(b)(2)(A); 8 U.S.C. § 1226(a), 8 U.S.C. § 1226(c). In the shadow of its decision to authorize detention of noncitizens during removal proceedings, Congress has also authorized the release of certain detained aliens on bond or parole. *See* 8 U.S.C. § 1226(a). Detained asylum seekers who are determined to have a credible fear of persecution are also entitled to request release from custody during the pendency of the asylum process. *See Matter of X–K–*, 23 I. & N. Dec. 731 (BIA 2005). By regulation, aliens eligible for release can seek custody redeterminations by an immigration judge of a custody decision made by an arresting or examining

immigration officer. 8 C.F.R. § 1003.19. Plaintiff-Petitioners' substantive due process claim of a right to prompt presentment arises from the intersection of their detention pending removal proceedings.

Defendant-Respondents argue that the features and rights afforded to persons detained by the government pending removal proceedings are not the constitutional rights afforded to persons in criminal proceedings and, thus, they cannot give rise to the substantive due process claim recognized in the authorities on which Plaintiff-Petitioners rely. (ECF No. 60-1 at 20.) The Court disagrees. As *Armstrong* counsels, these features and rights are intimately connected with "traditional due process concepts as notice and opportunity to be heard." *Armstrong*, 152 F.3d at 575. The existence of these rights necessarily underscores the importance of a prompt first appearance for a person detained by the government after being taken into custody, even when detention is for immigration purposes.

Having rejected Defendant-Respondents' attempts to differentiate Plaintiff-Petitioners' detention from other forms of detention blunts Defendant-Respondents' argument that Plaintiff-Petitioners' claims are a novelty that substantive due process cannot sustain. *Coleman*, *Armstrong*, and *Hayes* provide "guideposts for responsible decisionmaking" here. *Raich v. Gonzales*, 500 F.3d 850, 863 (9th Cir. 2007). In accordance with these guideposts, the relevant issue is whether the circumstances of Plaintiff-Petitioners' detention show that the Due Process Clause imposes a substantive constraint on the Government's detention of Plaintiff-Petitioners without prompt presentment to an immigration judge. Plaintiff-Petitioners have shown that such a substantive constraint applies here.

> **b.** **Alleged Infringement and the Government's Justification**

Even if a plaintiff identifies a particular interest that an asserted substantive

due process right protects, the challenged government conduct must "shock the conscience." The standard "erects a high-hurdle for would-be claimants." *Ms. L. v. U.S. Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 1166 (S.D. Cal. 2018). The challenged conduct must violate the "decencies of civilized conduct[,]" or interfere with rights "'implicit in the concept of ordered liberty[,]'" *Rochin v. California*, 342 U.S. 165, 169, 173 (1952) (citation omitted), or be so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency[,]" *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957). "[O]nly the most egregious official conduct can be said to be arbitrary in a constitutional sense." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

The nature of the substantive due process right in this case necessarily points to conduct that shocks the conscience. The authorities recognizing the substantive due process right to prompt presentment focus on the "totality of the circumstances." *Armstrong*, 152 F.3d at 570. When the government already provides a first appearance to a detained person, the inexplicable failure to promptly present the person to a judge cannot satisfy this standard. *See Coleman*, 754 F.2d at 724. The Eighth Circuit has affirmed that "[o]ur cases, and those of the Seventh Circuit . . . have held that post-arrest detentions of fifty-seven days, thirty-eight days, and eighteen days sufficiently shock the conscience to establish a substantive due process violation." *Luckes v. Cty. of Hennepin*, 415 F.3d 936, 940 (8th Cir. 2005) (affirming the principle but rejecting claim that "inefficiently executed booking and released procedures result[ing] in [plaintiff's] extended detention" for 24-hours shocked the conscience) (citing *Armstrong*, 152 F.3d at 581–82; *Hayes*, 388 F.3d at 675; *Coleman*, 754 F.2d at 723–24).

At the time of the Complaint-Petition's filing, Plaintiff-Petitioners Cancino, Hernandez, and Gonzalez allege that the Government detained them respectively for

a total of 20 days, 30 days, and 112 days—and counting. (Compl.-Pet. ¶¶ 47–49.) After the issuance of the NTA against Cancino on February 21, 2017 and DHS determination to retain Cancino in custody, Cancino requested a custody redetermination but he remained in detention without presentment to an immigration judge. (*Id*. ¶ 47.) No date had been scheduled for the initial MCH or bond hearing. (*Id*.) Hernandez had received no NTA, administrative warrant, or documents reflecting DHS's custody determination at the time of the Complaint-Petition's filing. (*Id*. ¶ 48.) Her bond hearing was scheduled for March 13, 2017—a date 34 days after she was initially taken into custody. Gonzalez was initially taken into custody when he presented himself at the San Ysidro Port of Entry. (*Id*. ¶ 49.) After he passed a credible fear interview, he was served with an NTA on January 5, 2017 and subsequently received a notice setting his first hearing in immigration court for April 5, 2017. (*Id*.) During his ongoing detention, Gonzalez alleges that he had not been presented to an immigration judge. (*Id*.) Plaintiff-Petitioners have plausibly alleged conduct that "shocks the conscience" in their continued detention without a prompt first appearance before an immigration judge.

Plaintiff-Petitioners further allege that Defendant-Respondents have a policy and practice of delaying presentment of persons detained in the Southern District of California for at least one to three months before presentment to an immigration judge. (Compl.-Pet. ¶¶ 4, 5, 7, 70, 72.) According to Plaintiff-Petitioners, "[t]he vast majority" of the "around 1,500 alleged non-citizens detained by DHS in this district on any given day" "have waited or are currently waiting between one to three months for a first hearing before a judge, and most are indigent and unrepresented by counsel." (*Id*. ¶ 5.) As with the alleged circumstances of Plaintiff-Petitioners' detention, these allegations point to conduct that "shocks the conscience" when viewed in relation to the liberty interest at stake and the recognized substantive due process right.

At this juncture, Defendant-Respondents must proffer a reason that sufficiently justifies the alleged deprivation of Plaintiff-Petitioners' liberty interest, in violation of the claimed substantive due process right. *See Reno*, 507 U.S. at 302 (stating that the government must identify a "compelling interest" and infringement that is "narrowly tailored" to such interest); *Lewis*, 523 U.S. at 846 (observing that substantive due process protects against the "exercise of power without any reasonable justification in the service of a legitimate governmental objective"); *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003) (stating that government must provide a "legitimate interest" that outweighs the substantive due process right).

Defendant-Respondents suggest that, as a general matter, they view the relevant justification for any detention challenged here to be that the "purpose of immigration detention" is to "put an end to a continuing violation of the immigration laws." (ECF No. 60-1 at 21 (citing *Lopez-Mendoza*, 468 U.S. at 1039).)[6] The Court cannot find that this rationale is sufficient to outweigh or excuse the substantive due process right Plaintiff-Petitioners claim. Taken to its logical end, recognition that Defendant-Respondents' proffered justification could sufficiently outweigh a personal interest in physical liberty would effectively trump any due process challenge to detention by persons detained by the government for removal proceedings, thereby rendering the Due Process Clause a dead letter as applied to

---

[6] Defendant-Respondents' reliance on *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) is misguided. *Lopez-Mendoza* held that an "an admission of unlawful presence in this country made subsequent[] to an allegedly unlawful arrest" need not be excluded pursuant to the Fourth Amendment "as evidence in a civil deportation hearing." *Id.* at 1034. In reaching this holding, the Supreme Court recognized that, at the time, deportation proceedings were "purely civil" and "the purpose of deportation [wa]s not to punish past transgression but rather to put an end to a continuing violation of the immigration laws." *Id.* at 1038–39. *Lopez-Mendoza*, however, did not concern a due process claim concerning detention and, therefore, its gloss on the nature of a removal proceeding is inapposite to the issue presented here.

them.[7]  This cannot be constitutionally correct.  The Supreme Court has expressly instructed that even the government's detention of noncitizens *with final orders of removal* is subject to constitutional scrutiny under the Due Process Clause.  *See Zadvydas*, 533 U.S. at 690.  Defendant-Respondents have therefore failed to offer a justification that would permit the violation of Plaintiff-Petitioners' claimed right to prompt presentment before an immigration judge.

\*       \*       \*

Having carefully considered the Complaint-Petition and the parties' arguments, the Court concludes that Plaintiff-Petitioners have sufficiently alleged conduct that "shocks the conscience" such that they may pursue their substantive due process claims beyond the motion to dismiss stage.  *See Ms. L*, 302 F. Supp. 3d at 1167 (permitting substantive due process claim to proceed past motion to dismiss stage because "the facts alleged are sufficient to show the government conduct at issue 'shocks the conscience' and violates Plaintiffs' [claimed] constitutional right[.]").  Persons detained by the government pending removal proceedings have no less an interest in their bodily freedom than persons the government detains in other contexts.  And, in any other context, the alleged "languishing" of persons in detention pending the commencement of proceedings, including pursuant to an alleged government policy and practice, would be unacceptable in the absence of a sufficient justification.  Accordingly, the Court denies Defendant-Respondents' motion to dismiss Plaintiff-Petitioners' substantive due process claims.

---

[7] Defendant-Respondents' proffered justification is also inconsistent with the fact that Congress has already decided that certain detained noncitizens charged with being removable under the immigration laws may nevertheless be released from detention during the pendency of his or her removal proceedings.  *See* 8 U.S.C. § 1226(a).  Defendant-Respondents have conceded that Cancino and Hernandez were detained pursuant to Section 1226(a).

### 2.    Procedural Due Process Claims

The Court turns next to Plaintiff-Petitioners' procedural due process claims. To assess procedural due process claims, courts employ the test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976). This test involves a balancing of three factors: (1) the nature of the private interest that will be affected, (2) the comparative risk of an erroneous deprivation of that interest with and without additional or substitute procedural safeguards, and (3) the nature and magnitude of any countervailing interest in not providing additional or substitute procedural requirements. *Turner v. Rogers*, 564 U.S. 431, 444–45 (2011) (alterations and internal quotation marks omitted). Under this test, due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Plaintiff-Petitioners claim that procedural due process requires a prompt post-arrest hearing before an immigration judge for noncitizens detained by Defendant-Respondents. (Compl.-Pet. ¶¶ 38–40.) And they specifically contend that "on the facts pleaded, incarceration for one to three months without a hearing fails that test" under the *Mathews* factors. (ECF No. 61 at 10.) The Court considers each of the *Mathews* factors and the parties' dismissal arguments.[8] In conducting its analysis, the Court is mindful that "the weighing process called for under *Mathews*, '. . . is more suitably addressed at the summary judgment stage of the case when a factual record has been developed.'" *Singh v. Cissna*, No. 1:18-cv-00782-SKO, 2018 WL 4770737, at *14 (E.D. Cal. Oct. 1, 2018) (quoting *Singh v. Holder*, No. C-13-4958 EMC, 2014 WL 117397, at *6 (N.D. Cal. Jan. 10, 2014)).

---

[8] As the Court discusses in Part A.3, Plaintiff-Petitioner Gonzalez is treated differently for the purposes of his procedural due process claim because he was an arriving alien when he was taken into government custody.

### a.     Plaintiff-Petitioners' Private Interest

"[T]he private interest at issue here is 'fundamental': freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.' That is beyond dispute." *Hernandez*, 872 F.3d at 990 (quoting *Foucha*, 504 U.S. at 80); *Singh*, 638 F.3d at 1204 ("The Supreme Court . . . repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty.").

Defendant-Respondents concede this factor in their opening brief by ignoring discussion of Plaintiff-Petitioners' liberty interest. (*See* ECF No. 60-1 at 13–16.) In reply, however, Defendant-Respondents argue that although "it is certainly true as a general matter that" the Due Process Clause protects a liberty interest in freedom from bodily restraint, "it does not necessarily follow that this liberty interest must be protected in the same manner in all contexts." (ECF No. 62 at 4.) Defendant-Respondents point to the Supreme Court's statement that "[d]etention during removal proceedings is a constitutionally permissible part of that process." *Demore*, 538 U.S. at 531. From this statement, Defendant-Respondents argue that "any assessment of the nature of the private interest that will be affected . . . must begin with an acknowledgment that aliens charged with being removable or inadmissible have no fundamental right to be released during removal proceedings." (ECF No. 62 at 4.) In support of this argument, Defendant-Respondents direct the Court to cases that discuss Congress's enactment of various INA provisions that authorize the detention of noncitizens during removal proceedings and certain implementing regulations. (*Id.* (citing *Jennings*, 138 S. Ct. at 838, and *Reno*, 507 U.S. at 306).)

The Court must reject Defendant-Respondents' belated reply argument. There exists a well-recognized liberty interest in freedom from bodily restraint. As the Court has already explained, Congress's recognized constitutional authority to authorize detention of noncitizens during removal proceedings does not shield such

authority from the limitations that the Due Process Clause commands to protect that interest. *See Hernandez*, 872 F.3d at 990 n.17 (citing *Zadvydas*, 533 U.S. at 695); *Singh*, 638 F.3d at 1203 (recognizing that "due process" requires that "the government's asserted justification for physical confinement outweigh[] the individual's constitutionally protected interest in avoiding physical restraint."). Therefore, Plaintiff-Petitioners' liberty interest cannot be lessened, nor extinguished on the ground that Congress may constitutionally authorize detention of noncitizens pending removal proceedings and has exercised such authority.[9] *See Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018) ("We have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of liberty would have thought so.").

### b.    Comparative Risk of an Erroneous Deprivation

The second *Mathews* factor "has two components: the risk that the procedures used will erroneously deprive [the] plaintiff of his liberty interest, and the value of additional or alternate procedural safeguards." *Oviatt v. Pearce*, 954 F.2d 1470, 1476 (9th Cir. 1992).

To challenge whether there is a risk of erroneous deprivation of the identified liberty interest, Defendant-Respondents argue that Plaintiff-Petitioners do not allege that they were erroneously detained. (ECF No. 60-1 at 14.) This argument, however,

---

[9] Plaintiff-Petitioners' claims also do not mandate release of any noncitizen. Therefore, recognition that the Due Process Clause requires prompt presentment of a detained noncitizen is not incompatible with, nor does it require the Court to invalidate Congress's provision for detention of noncitizens during removal proceedings. Indeed, all that would be necessary to afford relief on Plaintiff-Petitioners' procedural due process claim is for Defendant-Respondents to provide the procedural safeguard to which Plaintiff-Petitioners claim they are entitled.

must fail. "[T]he right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions." *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *Mathews*, 424 U.S. at 344 (recognizing that "procedural due process rules are shaped by the risk of error inherent in the truthfinding process *as applied to the generality of the cases*[.]" (emphasis added)). Thus, "at this stage of the *Mathews* calculus, we consider the interest of the erroneously detained individual." *Hamdi v. Rumsfeld*, 542 U.S. 507, 530 (2004) (citing *Carey*, 435 U.S. at 259). Defendant-Respondents simply do not address in their opening brief the risk of erroneous deprivation of physical liberty that results from the alleged one to three-month delay in presentment of detained individuals DHS claims are noncitizens to an immigration judge. (*See* ECF No. 60-1 at 14.)

Defendant-Respondents argue for the first time in reply, however, that there is no allegation "that the current procedures fail with some degree of frequency." (ECF No. 62 at 4.) Defendant-Respondents' belated reply argument ignores the Complaint-Petition's allegations which, if true, establish a risk of erroneous deprivation resulting from Defendant-Respondents' alleged policy and practice of delayed presentment. Plaintiff-Petitioners specifically allege that "detainees with legitimate claims to release are not given a hearing to assert them for one to three months." (ECF No. 61 at 13.) They contend that the risk of an erroneous deprivation of physical liberty is compounded by language barriers, "lack of sophistication regarding complex immigration laws," and "ignorance of procedures for seeking a bond hearing." (Compl.-Pet. ¶¶ 29–31.) These allegations plausibly show a meaningful risk of erroneous deprivation at the pleading stage.

The next issue then is the probative value of the additional safeguard Plaintiff-Petitioners request: a *prompt* first appearance before an immigration judge. This safeguard consists of two features: promptness and a "neutral adjudicator." (ECF

No. 61 at 13–15.)  There is a recognized value to a prompt post-deprivation hearing when a fundamental liberty interest is at issue even in non-confinement cases.  *See N. Ga. Finishing v. Di-Chem, Inc.*, 419 U.S. 601, 608 (1975) (concluding that a garnishment statute violated due process without any "provision for an early hearing."); *Campbell v. Burt*, 141 F.3d 927, 929 (9th Cir. 1998) (observing that due process "guarantees prompt post-deprivation judicial review in child custody cases").  As another district court recently recognized in a challenge by detained asylum seekers who sought prompt bond hearings, "[e]lsewhere in the civil commitment context, there is a long history of courts which have found that due process requires an expeditious hearing, often defined as a period of no longer than seven days." *Padilla v. United States Immigration & Customs Enforcement*, No. C18-928-MJP, —F. Supp. 3d—, 2019 WL 1506754, at *7 (W.D. Wash. Apr. 5, 2019) ("find[ing] that a timeline of seven days from the date of the bond hearing request is consistent with both Congressional intent and judicial precedent and represents a procedural safeguard providing the value of an opportunity to be heard at a meaningful time regarding this fundamental interest possessed by the class members.").

There is also a recognized due process value to presentment to a neutral adjudicator.  "[D]ue process requires a neutral and detached judge in the first instance." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 617 (1993) (citation and quotation marks omitted).  "The requirement of neutrality has been jealously guarded by this court." *Mashall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).  Congress has implicitly recognized the value of removal proceedings occurring before an immigration judge, rather than an officer of the arresting agency.  *See* 8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding inadmissibility or deportability of an alien.").  And as Plaintiff-Petitioners underscore, the determinations regarding initial custody and detention are made by officers of the arresting agency.  (ECF No. 61 at 15.)

Defendant-Respondents nevertheless contend that "there are a number of procedural safeguards already in place to ensure the fundamental fairness to aliens detained for immigration purposes." (ECF No. 60-1 at 14.) Defendant-Respondents identify what they contend are the relevant set of procedural safeguards: (1) the custody determination by an examining immigration officer that by regulation must occur within 48 hours of a warrantless arrest, 8 C.F.R. § 287.3(d), (2) the officer's advisals regarding free legal services, 8 C.F.R. § 287.3(c), and (3) the ability of certain detained noncitizens who are denied bond by an immigration officer to request a custody redetermination by an immigration judge at any time before the issuance of a final order of removal, 8 U.S.C. § 1226(a), 8 C.F.R. §§ 236.1(d)(1), 1003.19, 1236.1(d)(1).[10]   And Defendant-Respondents contend that "immigration officials are entitled to a presumption of regularity" in their discharge of these regulations. (ECF No. 62 at 5.)  Defendant-Respondents conclude that "[i]n sum, Plaintiffs have failed to provide any evidence that aliens are being wrongfully detained because of a lack of additional process." (ECF No. 60-1 at 15; ECF No. 62 at 3.)

---

[10] Untethered to any *Mathews* factor but appearing in their procedural due process argument, Defendant-Respondents also argue that it would be impermissible for the Court to "find that the existing statutory scheme is unconstitutional insofar as it permits detention prior to initial hearing." (ECF No. 60-1 at 12.)  And they argue that applying the canon of constitutional avoidance "to read into the statute an implicit deadline for initial presentment before an immigration judge" is "foreclosed by" *Jennings*.  Defendant-Respondents, however, mistake *Jennings*'s statutory construction analysis with a limitation on this Court's ability to find that the Due Process Clause requires the procedural safeguard Plaintiff-Petitioners seek.  Indeed, the Supreme Court expressly remanded the case for consideration of the constitutional claims on their merits.  *See Jennings*, 138 S. Ct. at 851.  The Court therefore finds it unnecessary to address the parties' sparring over application of the constitutional avoidance doctrine to the web of statutes and regulations from which the Government's authority to detain and commence removal proceedings against alleged noncitizens emanates.

Undergirding Defendant-Respondents' argument is their reliance on *Reno v. Flores*, 507 U.S. 292 (1993), a case in which the Supreme Court rejected a facial challenge to an INS regulation and in which the respondents "d[id] not challenge its application in a particular instance." *Id.* at 299. Because the challenge was facial, the *Reno* respondents had to "establish that no set of circumstances exists under which the [regulation] would be valid[.]" *Id.* (quoting *Salerno*, 481 U.S. at 745).

Unlike the *Reno* respondents, Plaintiff-Petitioners expressly acknowledge that they raise an as-applied challenge limited to an alleged policy and practice in the Southern District of California of unreasonably delaying the presentment of detained noncitizens to an immigration judge. (ECF No. 61 at 12.) Curiously, Defendant-Respondents concede in reply that "it is conceivable that an individual immigration detainee may bring a procedural due process claim based on the lack of prompt presentment based on the fact facts of his or her particular case[.]" (ECF No. 62 at 6 n.6.) Defendant-Respondents' concession underlies the inappropriateness of their argument at this stage of the proceedings. If Plaintiff-Petitioners cannot provide evidence to substantiate their as-applied challenge, that is an evidentiary issue suitable for a motion for summary judgment or trial, not on a motion to dismiss. *See Van Buskirk v. Cable News Network*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss[.]"). At this stage, the Court concludes that Plaintiff-Petitioners have proffered allegations that plausibly show a probative value of the additional safeguard Plaintiff-Petitioners seek.

c.      **The Government's Interest**

The final *Mathews* factor concerns "the government's interest, including the additional costs and administrative burdens that additional procedures would entail." *Buckingham*, 603 F.3d at 1082. Defendant-Respondents aver that "the government's

interest in the existing process is extensive, as is the potential for significant fiscal and administrative burdens from any additional process." (ECF No. 60-1 at 15.) The Court is not persuaded that Defendant-Respondents' arguments mandate dismissal of Plaintiff-Petitioners' claims at this stage.

Defendant-Respondents' sole assertion in their opening brief is that the procedural safeguards Plaintiff-Petitioners seek "would create a ripple effect" in that "any mandate to accelerate one particular phase of the process will necessarily result in delays at other phases" because "DHS and the immigration courts have finite resources." (*Id.*) Defendant-Respondents aver that "a judicially-imposed deadline for all initial [MCHs] may ultimately impede immigration judges' ability to provide prompt hearings (including subsequent master calendar and merits hearings) for other detained aliens." (*Id.*)

As an initial matter, the Court turns to a thread that runs through Defendant-Respondents' argument on the third *Mathews* factor—specifically, that it would be an improper "judicial imposition" for this Court to find that Plaintiff-Petitioners possess a procedural due process right that compels prompt presentment of persons detained by the government after their initial arrest. (*See* ECF No. 60-1 at 1 ("Mere invocation of the Due Process Clause does not authorize judicial intervention of the sort that Plaintiffs propose."); *id.* at 15.)

The Court acknowledges that courts should proceed with caution when considering claims that concern that government's power over immigration. *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1232 (9th Cir. 2018) ("The courts have 'long recognized' questions of immigration policy as 'more appropriate to either the Legislature or the Executive than to the Judiciary.'" (quoting *Mathews*, 426 U.S. at 81)). But acknowledgement of this power does not negate the judicial duty to

consider and resolve a case or controversy over which a federal court has jurisdiction, including when the case or controversy involves claims arising under constitutional provisions that expressly limit the government's power in this arena. "[I]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Thus, notwithstanding their recognized power over immigration, "[w]e may nevertheless review the political branches' actions to determine whether they exceed the constitutional or statutory scope of their authority." *E. Bay Sanctuary Covenant*, 909 F.3d at 1232. Accordingly, while the government has an interest in this arena, the interest must nevertheless be carefully balanced against the physical liberty interest possessed by a person detained by the government.

The Court is otherwise not persuaded by Defendant-Respondents' burden argument at this stage. Defendant-Respondents rely on a single district court decision in which the court determined that the additional process sought by the plaintiffs in that case, specifically a probable cause determination conducted by an immigration judge, "would certainly burden ICE" and thus "weighs heavily against the imposition of additional procedures, especially considering the possible costs." *Aguilar v. U.S. Immigration & Customs Enforcement Chicago Field Office*, 346 F. Supp. 3d 1174, 1192 (N.D. Ill. 2018). This case, however, does not compel the same burden analysis as in *Aguilar*. The *Aguilar* court construed the due process claims to request a judicial probable cause determination as an additional procedural safeguard in the removal context, a feature that does not exist in the current removal proceeding scheme. Not only does this case no longer involve Fourth Amendment claims, the Plaintiff-Petitioners' procedural due process claims do not seek to fashion from whole cloth a new procedural safeguard.

Instead, the procedural due process claims in this case concern the timing of

the hearing that is already an established part of removal proceedings and which is already conducted by an immigration judge. As Plaintiff-Petitioners compellingly argue, "when a state provides for a first appearance, it would place a small burden on the state to ensure the timeliness of that appearance." *Armstrong*, 152 F.3d at 572. The Complaint-Petition also suggests that the claimed timing safeguard might not impose an undue administrative burden. Plaintiff-Petitioners allege that "[i]f the case involves a detained individual, EOIR puts the case on the immigration court's detained docket, which is more expedited than its non-detained docket." (Compl.-Pet. ¶ 28.) Assuming its truth, this allegation suggests that a prompt presentment requirement might pose a minimal burden to EOIR. *See Hernandez*, 872 F.3d at 994 (concluding that proposed "requirement that ICE and IJs consider financial circumstances and alternative conditions of release" would impose a "minimal burden" in part because "consideration of financial circumstances [wa]s already 'implicitly' required[.]"). Therefore, there is at least a plausible ground for the Court to conclude that Plaintiff-Petitioners' procedural due process claims pass muster at the Rule 12(b)(6) stage.

More critically, unlike the *Aguilar* court, "th[is] Court cannot, on this scant record, evaluate in a meaningful way the burden that would be imposed by the additional due process." *Singh*, 2018 WL 4770737, at *14. Defendant-Respondents raise the specter of possible administrative burdens, but "at this juncture, [these possible burdens] are not sufficiently quantified or developed to allow the Court to engage in the balancing required by *Mathews*." *J.E.F.M. v. Holder*, 107 F. Supp. 3d 1119, 1143 (W.D. Wash. 2015), *aff'd in part and rev'd in part by*, *J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016). It might be that a prompt presentment requirement for detained persons could drain resources on the front-end of removal proceedings. But it is equally possible that a prompt presentment safeguard for detained persons could actually free up resources currently consigned to the alleged one to three

months in which Plaintiff-Petitioners and others like them in the Southern District of California allegedly "languish" in detention before they are presented to an immigration judge. *See Hernandez*, 872 F.3d at 996 (observing that "reduced detention costs can free up resources to more effectively process claims in Immigration Court."). The Court cannot say that the procedural safeguard Plaintiff-Petitioners seek would impose a burden on Defendant-Respondents at the motion to dismiss stage.

*     *     *

On balance, the Court finds that application of the *Mathews* factors, based on the Complaint-Petition's factual allegations and the parties' dismissal briefing, counsels that Plaintiff-Petitioners Cancino and Hernandez have stated plausible procedural due process claims. Accordingly, the Court denies Defendant-Respondents' motion to dismiss these claims.

### 3.     Plaintiff-Petitioner Gonzalez's Due Process Clause Claims

Irrespective of the merits of the particular substantive and procedural process claims asserted in this case, Defendant-Respondents move to dismiss any such claims asserted by Plaintiff-Petitioner Gonzalez on the ground that he is an arriving alien for whom there are no "due process rights beyond those which Congress provides him." (ECF No. 60-1 at 16.) In opposition, Plaintiff-Petitioners argue that the entry fiction on which Defendant-Respondents rely has no application in this case. (ECF No. 61 at 24–25.)

The Supreme Court has recognized that "our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those are within the United States after an entry, irrespective of its legality. In the latter instance, the Court has recognized additional rights and privileges not

– 38 –

extended to those in the former category who are merely 'on the threshold of initial entry.'" *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). "Aliens inside the U.S., regardless of whether their presence here is temporary or unlawful, are entitled to certain constitutional protections unavailable to those outside our borders." *Kwai Fun Wong. United States*, 373 F.3d 952, 970 (9th Cir. 2004) (citing *Zadvydas*, 533 U.S. at 693; *Xi v. U.S. INS*, 298 F.3d 832, 837 (9th Cir. 2002)). But for those aliens "on the threshold of initial entry," "'[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'" *Mezei*, 345 U.S. at 212 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950)). "This principle has given rise to the 'entry fiction,' a legal concept which holds that 'excludable aliens,' '[e]ven if physically in this country, . . . are legally detained at the border' and treated as if they have not entered the country." *Padilla v. U.S. Immigration & Customs Enforcement*, 354 F. Supp. 3d 1218, 1225 (W.D. Wash 2018) (quoting *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985)). "Applying this legal fiction, *Mezei* held that the procedural due process rights of an alien detained on Ellis Island were not violated when he was excluded without a hearing." *Kwai Fun Wong*, 373 F.3d at 971 (citing *Mezei*, 345 U.S. at 214).

Plaintiff-Petitioner Gonzalez alleges that he was taken into custody and detained after he presented himself at the San Ysidro Port of Entry. (Compl.-Pet. ¶ 49.) Plaintiff-Petitioners effectively concede that Gonzalez is an "arriving alien" under applicable law. *See* 8 U.S.C. § 1225(a)(1); (ECF No. 61 at 22.) Thus, the next issue for the Court is the application of the entry fiction to Gonzalez's substantive and procedural due process claims.

Turning first to Gonzalez's procedural due process claim, the Ninth Circuit has repeatedly affirmed that the entry fiction principle is "determinative of the

*procedural* rights of aliens with respect to their applications for admission." *Alvarez-Garcia v. Ashcroft*, 378 F.3d 1094, 1099 (9th Cir. 2004) (citation omitted); *Kwai Fun Wong*, 373 F.3d at 971 (same). "It is clear . . . that excludable aliens have no procedural due process rights in the admission process[.]" *Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1449 (9th Cir. 1995) (en banc). Plaintiff-Petitioners resist application of the entry fiction on the ground that Gonzalez does not challenge the validity of the procedures to admit or exclude him. (ECF No. 61 at 23.) Plaintiff-Petitioners' argument runs contrary to the entry fiction itself. Although the fiction is regarded as narrow, it is not as narrow as Plaintiff-Petitioners posit. *See Angov v. Lynch*, 788 F.3d 893, 898 (9th Cir. 2015) ("[The alien] has no . . . right [to procedural due process]. He presented himself at the San Ysidro port of entry without valid entry documents and sought asylum. . . . [T]hose, like [the alien], who have never technically 'entered' the United States have no such rights." (emphasis added)).

Plaintiff-Petitioners do not otherwise proffer allegations which show that he was taken into government custody after having already entered the United States, the circumstance in which courts have found the entry fiction categorically inapplicable. *See Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, [his/her] legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *United States v. Raya-Vaca*, 771 F.3d 1195, 1202 (9th Cir. 2014) (finding that Due Process Clause applied without limitation to an alien who "had entered the United States in July 2011 before he was apprehended" and thus "Raya-Vaca was entitled to expedited removal proceedings that conformed to the dictates of due process"); *Padilla*, 354 F. Supp. 3d at 1226 (finding that detained plaintiff asylum seekers had plausibly alleged that they were "'*Raya-Vaca* aliens,' detained after crossing over the border of this country" and "thus enjoy inherent constitutional due process protections which they are entitled to

vindicate through the legal process."). Gonzalez, however, alleges that he was taken into custody after he presented himself at a port of entry. (Compl.-Pet. ¶ 49.) Accordingly, the Court grants Defendant-Respondents' motion to dismiss insofar as the motion concerns Gonzalez's procedural due process claim.

Although the entry fiction warrants dismissal of Gonzalez's procedural due process claim, the fiction does not similarly foreclose Gonzalez's substantive due process claim. As the Ninth Circuit has recognized, "[w]hile it is clear . . . that excludable aliens have no procedural due process rights in the admission process, the law is not settled with regard to nonprocedural rights." *Barrera-Echavarria*, 44 F.3d at 1449 (considering substantive due process right to be free from detention); *see also Sierra v. INS*, 258 F.3d 1213, 1218 n.3 (10th Cir. 2001) (noting that the entry fiction "applies to procedural due process challenges such as Sierra's. This case does not involve, and we do not address, a substantive due process challenge."). The Ninth Circuit has also held "the entry fiction does not preclude substantive constitutional protection," including specifically under the Fifth Amendment. *Kwai Fun Wong*, 373 F.3d at 973. Other circuits have also recognized that aliens subject to the entry fiction may be entitled to substantive due process rights. "Even an excludable alien is a 'person' for purposes of the Fifth Amendment and is thus entitled to substantive due process." *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 396 (3d Cir. 1999); *see also Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987) (holding that the entry fiction "determines the aliens' rights with regard to immigration and deportation proceedings[,]" but "does not limit the right of excludable aliens detained within United States territory to humane treatment."). Because the entry fiction does not foreclose Gonzalez's substantive due process claim, the Court denies Defendant-Respondents' motion to dismiss the claim.

### B.    APA Claims

Plaintiff-Petitioners raise Sections 706(1) and Section 706(2) APA claims based on the same conduct that they allege violates their substantive and procedural due process rights under the Fifth Amendment Due Process Clause. (Compl.-Pet. ¶¶ 85–90 (citing 5 U.S.C. §§ 706(1), 702(A)–(D).)  Defendant-Respondents move to dismiss all APA claims. (ECF No. 60-1 at 21–22; ECF No. 62 at 10.)  Because Plaintiff-Petitioners' opposition defends only the sufficiency of Plaintiff-Petitioners' Section 706(2) claims, the Court construes Defendant-Respondents' motion as unopposed on the Section 706(1) claims. (*See* ECF No. 61 at 24–25.)  The Court dismisses the Section 706(1) claims without prejudice and confines its analysis to Plaintiff-Petitioners' Section 706(2) claims.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  This judicial review provision "is not so all-encompassing as to authorize . . . judicial review over everything done by an administrative agency." *Wild Fish Conservancy v. Jewell*, 703 F.3d 791, 800–01 (9th Cir. 2013).  The APA confines what is subject to judicial review by limiting review to an "agency action," which is in turn defined to only "include[] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2) (incorporating Section 551's definition of "agency action").

The APA also places limits on when agency action is subject to judicial review.  "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704; *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1171 (9th Cir. 2017) ("[]§ 704's requirement that to proceed under the APA, agency action must be final or

otherwise reviewable by statute is an independent element without which courts may not determine APA claims."). "Two conditions must be satisfied for an agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *United States Army Corps of Engineers v. Hawkes Co*., 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). An unwritten policy can satisfy the APA's final agency action requirement. *Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1319 (S.D. Cal. 2018) ("An unwritten policy can still satisfy the APA's pragmatic final agency action requirement."); *Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (same).

Defendant-Respondents contend that even assuming there is agency action in form of a sanction, there is no reviewable final agency action in this case because "[Plaintiff-Petitioners'] claim is rooted in an allegation of unlawful delay[.]" (ECF No. 60-1 at 22.) The Court rejects Defendant-Respondents' finality argument because it does not account for the actual nature of Plaintiff-Petitioners' challenge. Plaintiff-Petitioners challenge what they contend is a policy by which Defendant-Respondents detain alleged noncitizens for one to three months before presentment to an immigration judge. (Compl.-Pet. ¶¶ 1, 4–5, 7, 70, 72.) Plaintiff-Petitioners expressly underscore this point in their opposition. (ECF No. 61 at 25.) Defendant-Respondents conspicuously do not challenge Plaintiff-Petitioners' policy allegations and contentions. At this stage, the Court finds that Plaintiff-Petitioners have adequately alleged a final agency action in form of an alleged policy to detain Plaintiff-Petitioners for one to three months before presentment to an immigration judge.

Defendant-Respondents next challenge the merits of Plaintiff-Petitioners' particular Section 706(2) claims. (ECF No. 60-1 at 22.) Under Section 706(2), a court "shall hold unlawful and set aside agency action . . . found to be," *inter alia*, "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "(D) without observance of procedure required by law . . . ." 5 U.S.C. § 706(2).

Defendant-Respondents argue in a single sentence and corresponding footnote that Plaintiff-Petitioners' Section 706(2)(A), (C), and (D) claims fail because the APA does not "provide additional rights to aliens in removal proceedings beyond those provided in the INA and its implementing regulations." (ECF No. 60-1 at 22.) Defendant-Respondents' argument is not tethered to any legal standard for assessment of APA claims raised under these provisions. Defendant-Respondents also overlook that Plaintiff-Petitioners do not invoke the APA to fashion new rights beyond the INA, but rather as means to seek review of agency action in the context of the claimed due process rights. In any event, the parties' briefing on the sufficiency of these Section 706(2) claims is thin. Accordingly, the Court concludes that the sufficiency of Plaintiff-Petitioners' Section 706(2)(A),(C), and (D) has not been distinctly raised or adequately briefed and thus the Court declines to dismiss the claims now. *See Carroll v. Nakatani*, 342 F.3d 934, 942 (9th Cir. 2003) (holding that a court need not review arguments not specifically and distinctly raised in a party's opening brief).

Defendant-Respondents otherwise argue that Plaintiff-Petitioners' Section 706(2)(B) constitutional claims fail because Plaintiff-Petitioners fail to identify any constitutional rights. (ECF No. 60-1 at 22.) This argument necessarily fails because the Court has concluded that all Plaintiff-Petitioners state constitutional due process

claims. Accordingly, the Court denies Defendant-Respondents' motion to dismiss Plaintiff-Petitioners' Section 706(2)(B) claims as well.

### CONCLUSION & ORDER

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant-Respondents' renewed motion to dismiss. (ECF No. 60.) The Court **DISMISSES** (1) Plaintiff-Petitioner Gonzalez's procedural due process claim and (2) all Plaintiff-Petitioners' Section 706(1) APA claims. Defendant-Respondents **SHALL ANSWER** the operative portions of the Complaint-Petition **no later than July 15, 2019**.

As a final matter, the parties requested in a prior status report that the Court decide the previously briefed motion for class certification if the Court denied Defendant-Respondents' motion to dismiss. (ECF No. 57 ¶ 5.) The Court **DECLINES** this request. Given the changes in this case since the original motion was filed, Plaintiff-Petitioners are instead directed to file a renewed motion if they wish to pursue class certification. The parties may propose an appropriate briefing schedule for a renewed motion for class certification **no later than June 25, 2019**.

**IT IS SO ORDERED.**

**DATED: June 7, 2019**

Hon. Cynthia Bashant
United States District Judge

17cv491