Bardis Vakili (SBN 247783) (bvakili@aclusandiego.org)
David Loy (SBN 229235) (davidloy@aclusandiego.org)
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4485

Joanna Fuller (SBN 266406) (jfuller@fr.com)
Aleksandr Gelberg (SBN 279989) (gelberg@fr.com)
Megan A. Chacon (SBN 304912) (chacon@fr.com)
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 678-5070

Leonard B. Simon (SBN 58310) (lens@rgrdlaw.com)
LAW OFFICES OF LEONARD B. SIMON P.C.
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: (619) 338-4549

*Counsel for Plaintiff-Petitioners*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ORLANDO CANCINO CASTELLAR, ANA MARIA HERNANDEZ AGUAS, MICHAEL GONZALEZ, <br><br> Plaintiff-Petitioners, <br><br> v. <br><br> KEVIN MCALEENAN, Secretary of Homeland Security; et al., <br><br> Defendant-Respondents. | Case No. 3:17-cv-0491-BAS-AHG <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF-PETITIONERS' RENEWED MOTION FOR CLASS CERTIFICATION** <br><br> Date: **Dec. 7, 2020** <br> Time: **1:00 P.M.** <br> Courtroom: **4B** <br> Judge: **Cynthia A. Bashant** <br><br> **REDACTED VERSION** |

I.      INTRODUCTION .................................................................................... ii

II.     LEGAL AND FACTUAL BACKGROUND ........................................ 2

        A.   Legal Framework for Determinations Regarding
             Custody and Initiation of Removal Proceedings for
             Putative Class Members ............................................................ 2

        B.   Defendants' Policies and Practices Causing and
             Exacerbating the Harms of Lengthy Detention without
             Presentment ................................................................................. 4

             1.   Booking Process ................................................................ 4

             2.   Presentment Delays and Policies that Contribute
                  to Them ............................................................................... 7

             3.   Policies Exacerbating the Harms Caused by
                  Delays .............................................................................. 11

        C.   Plaintiffs' Experiences with Defendants' Policies ............... 12

        D.   Plaintiffs Seek to Represent a Class Based on the Record
             as Developed .............................................................................. 15

III.    ARGUMENT .......................................................................................... 16

        A.   The Proposed Class Satisfies Rule 23(a)'s Requirements ....... 17

             1.   Numerosity: The proposed class consists of
                  thousands of immigration detainees ............................. 17

             2.   Commonality: Several common questions of law
                  and fact exist among the class members. ...................... 18

             3.   Typicality: Plaintiffs' claims are typical of, if not
                  identical to, those of other class members .................... 20

             4.   Adequacy: Plaintiffs will adequately protect the
                  interests of the proposed class, and their counsel
                  are more than qualified to litigate this action. ........... 21

        B.   This Case Satisfies Rule 23(b)(2) Because it Seeks to
             Declare Illegal and Enjoin a Practice that Applies to the
             Class as a Whole. ....................................................................... 22

IV.     CONCLUSION ...................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
   731 F.3d 952 (9th Cir. 2013) ............................................................... 18

*Al Otro Lado, Inc. v. Wolf*,
   No. 17-CV-02366-BAS-KSC, 2020 WL 4530755 (S.D. Cal. Aug. 6, 2020) ...... 19, 20

*Alcantara v. Archambeault*,
   No. 20CV0756 DMS (AHG), 2020 WL 2315777 (S.D. Cal. May 1, 2020)............ 17

*Aleman-Gonzalez v. Sessions*,
   325 F.R.D. 616 (N.D. Cal. 2018) ........................................................ 16

*Alford v. County of San Diego*,
   151 Cal. App. 4th 16 (2007)............................................................... 21

*Bee, Denning, Inc. v. Capital All. Grp.*,
   310 F.R.D. 614 (S.D. Cal. 2015) .................................................... 15, 16

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ........................................................... 22

*Clarkson v. Coughlin*,
   145 F.R.D. 339 (S.D.N.Y. 1993)......................................................... 17

*Damus v. Nielsen*,
   313 F. Supp. 3d 317 (D.D.C. 2018)........................................................ 8

*Designating Aliens for Expedited Removal*,
   69 FR 48877 (Aug. 11, 2004)............................................................... 3

*Designating Aliens for Expedited Removal*,
   84 FR 35409 (July 23, 2019) ............................................................... 3

*Doe v. Wolf*,
   424 F. Supp. 3d 1028 (S.D. Cal. 2020) .................................... 16, 17, 18, 23

*Franco-Gonzalez v. Holder*,
   CV 10-02211............................................................................... 14, 17

*Franco-Gonzalez v. Napolitano,*
 CV 10–02211 ............................................................................................ 17

*Garcia v. Johnson,*
 No. 14–cv–01775–YGR, 2014 WL 6657591 (N.D. Cal. Nov. 21, 2014) ............... 17

*Hawker v. Consovoy,*
 198 F.R.D. 619 (D.N.J. 2001) .................................................................. 17

*Hernandez v. County of Monterey,*
 305 F.R.D. 132 (N.D. Cal. 2015) ............................................................. 22

*J.D. v. Nagin,*
 255 F.R.D. 406 (E.D. La. 2009) ............................................................... 17

*Lynch v. Rank,*
 604 F. Supp. 30 (N.D. Cal. 1984), *aff'd*, 747 F.2d 528 (9th Cir. 1984) .............. 22

*Lyon v. U.S. Immigration & Customs Enf't,*
 308 F.R.D. 203 (N.D. Cal. 2015) ............................................................. 18

*Lyon v. U.S. Immigration & Customs Enforcement,*
 300 F.R.D. 628 (N.D. Cal. 2014) ............................................................. 17

*Padilla v. US Immigration & Customs Enf't,*
 No. C18-928 MJP, 2019 WL 1056466 (W.D. Wash. Mar. 6, 2019) ...................... 16

*Padilla-Ramirez v. Bible,*
 882 F.3d 826 (9th Cir. 2017) .................................................................. 15

*Parsons v. Ryan,*
 754 F.3d 657 (9th Cir. 2014) ..................................................... 20, 22, 23

*Rivera v. Holder,*
 307 F.R.D. 539 (W.D. Wash. 2015) ...................................................... 17, 23

*Rodriguez v. Hayes,*
 591 F.3d 1105 (9th Cir. 2010) ....................................................... *passim*

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
 559 U.S. 393 (2010) ............................................................................ 16

*Walters v. Reno,*
 145 F.3d 1032 (9th Cir. 1998) ......................................................... 18, 22

**Statutes**

8 U.S.C. § 1182(b)(5) ................................................................................ 4

8 U.S.C. § 1225(b)(1) ........................................................................ 3, 4, 10

8 U.S.C. § 1362 ..................................................................................... 11

Administrative Procedure Act ................................................................. 18

section 240 of the Immigration and Nationality Act, 8 U.S.C. § 1229a, and (2) ........... 3

INA ................................................................................... 6, 11, 19

section 235(b) of the INA .......................................................................... 3

**Other Authorities**

8 C.F.R. § 100.1 ...................................................................................... 6

8 C.F.R. § 235.6(a)(1)(ii), (iii) .................................................................. 4

8 C.F.R. § 287.3(d) ................................................................................... 3

8 C.F.R. § 1003.19(d) ............................................................................. 10

Fifth Amendment ....................................................................................... 18

Fed. R. Civ. P. 23(b)(2) ................................................................. 2, 16, 22, 23

Rule 23(a) .................................................................................... *passim*

Rule 30(b)(6) ................................................................................... 4, 8

# I.  INTRODUCTION

Plaintiff-Petitioners ("Plaintiffs") brought this action to prevent Defendant-Respondents ("Defendants") from continuing to imprison thousands of persons for weeks or months without presenting them to a neutral adjudicator for a first appearance. As the Court has held, Plaintiffs state a claim Defendants are systemically violating due process by holding persons in immigration detention without promptly presenting them to a judge for a first appearance, regardless of whether they just arrived in the United States or have lived here for years.  ECF No. 63. To address that systemic claim, Plaintiffs moved to certify a class, which the Court deferred for development of the record. *Id.* at 45. As developed in discovery, the record confirms that Defendants continue to engage in system wide policies and practices that cause systemic delays in presenting detained persons to a judge, and this Court could remedy those systemic delays with a single order. Accordingly, Plaintiffs renew their motion for class certification.

This case meets the four threshold requirements of Rule 23(a). *First*, the class is numerous under Rule 23(a)(1) because it is a transitory class including thousands of individuals detained by Defendants now or in the future without prompt presentment. *Second*, the case presents common questions under Rule 23(a)(2), because all class members are complaining of similar treatment and making claims under the same laws and theories—that extended detention without presentment to an immigration judge ("IJ") is unlawful—and a ruling in Plaintiffs' favor would cure the harms inflicted on all class members. Whatever slightly differing procedural rights class members may have in their individual cases, all class members have the same constitutional due process right to a prompt first appearance where an IJ informs them of those rights. Even if some class members face more egregious delays than others, the same constitutional questions, and the same constitutional floor applies to all class members, and all class members' delays are well below that floor. *Third*, for essentially the same reasons, the

Case No.3:17-cv-00491-BAS-BGS

named Plaintiffs present claims typical of the class under Rule 23(a)(3). Each endured detention of several weeks or more without a judicial hearing, consistent with the experience of class members and far longer than due process permits. *Fourth*, the class representatives will fairly and adequately protect the class under Rule 23(a)(4). Class counsel are experienced in civil rights, immigration, and class action cases, and the named Plaintiffs have no conflict with the class because they sought the same relief for themselves as they do for the rest of the class.

This case also qualifies for certification under Rule 23(b). The due process claim stated by Plaintiffs applies generally to the class, "so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). If Plaintiffs prevail, the Court could enter a single injunction that simply requires a prompt first appearance before an immigration judge for all class members, as well as corresponding declaratory relief. Such a ruling would ensure that detained persons may avail themselves of whatever rights and remedies are available to them in immigration proceedings, but it would not dictate the result of any individual removal or custody proceedings.

Like other civil rights cases, including those on behalf of people detained in immigration custody, this case presents at least one common issue that can be resolved for many plaintiffs in one proceeding. To fight this issue one case at a time makes no sense. As a result, this is a classic case for class certification.

## II. LEGAL AND FACTUAL BACKGROUND

### A. Legal Framework for Determinations Regarding Custody and Initiation of Removal Proceedings for Putative Class Members

The Court has previously addressed, and Plaintiffs will not repeat at length, the relevant legal framework governing the apprehension, continued detention, and initiation of removal proceedings for individuals encountered by Defendants and

alleged to be removable other than through expedited removal. ECF No. 63 at 3:15-4:21. Briefly, with exceptions not relevant here, applicable regulations require Defendants to decide within 48 hours of arresting an alleged non-citizen whether they will (1) issue a Notice to Appear ("NTA") that commences "regular" removal proceedings under section 240 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1229a, and (2) subject the individual to continued custody for those proceedings. 8 C.F.R. § 287.3(d). Significantly, if Defendants choose to initiate removal proceedings, they retain discretion to release nearly all such persons from detention during those proceedings. ECF No. 28-1 at 5:7, n.5 (citing 8 U.S.C. §§ 1182(b)(5), 1226(a)).

People seeking asylum after being placed in expedited removal proceedings have a slightly different path before seeing an immigration judge, but all have a right to do so. Specifically, Defendants have the discretion to place people who presents at a port of entry or who Defendants encounter within 100 miles of a land border and had been in the U.S. for less than 14 days into "expedited" removal proceedings under section 235(b) of the INA rather than issue an NTA, if an immigration official determines they are inadmissible based on fraud or lack of valid entry documents.[1] 8 U.S.C. § 1225(b)(1)(a)(i); Declaration of Bardis Vakili in support of Renewed Motion for Class Certification ("Vakili Decl."), Ex. 9 (DHS Responses to First Set of Requests for Admission, Resp. to RFA No. 3). This can result in a final "expedited" removal order "*unless* [they] indicate[] either an intention to apply for asylum… or a

---

[1] The 14-day, 100-mile limitation on expedited removal has been in existence since 2004. *Designating Aliens for Expedited Removal,* 69 FR 48877 (Aug. 11, 2004). On July 23, 2019, the government published notice of its intent to expand its expedited removal authority to include individuals encountered anywhere in the United States who have been present less than two years. *Designating Aliens for Expedited Removal*, 84 FR 35409 (July 23, 2019), available at https://www.govinfo.gov/content/pkg/FR-2019-07-23/pdf/2019-15710.pdf. Defendants may implement this expansion at any time.

fear of persecution." *Id.* (emphasis added). If they so indicate, they remain in Defendants' custody for a "credible fear" interview – a threshold screening to determine whether they have a "significant possibility" of "establish[ing] eligibility for asylum." 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(v). Those who pass the screening, whether immediately or after an IJ overrules a negative screening determination, will be placed in regular removal proceedings before an IJ. 8 U.S.C. § 1225(b)(1)(B)(ii), (iii)(III); 8 C.F.R. § 235.6(a)(1)(ii), (iii). Those who waive their right to IJ review, or for whom a reviewing IJ upholds the negative determination, receive final expedited removal orders. 8 U.S.C. § 1225(b)(1)(B)(iii)(I).

Again, Defendants retain discretion to release people from detention pending credible fear interviews or removal proceedings. 8 U.S.C. § 1182(b)(5); Vakili Decl., Ex. 4 (███████████, Rule 30(b)(6) Witness for ICE, Dep. Tr. ["ICE Dep."] at 170:4-22), Ex. 5 (██████████, Rule 30(b)(6) Witness for CBP OFO, Dep. Tr. ["OFO Dep."] at 96:20-98:1, 111:10-112:9), Ex. 6 (███████████, Rule 30(b)(6) Witness for CBP Border Patrol, Dep. Tr. ["Border Patrol Dep."] at 127:5-12,[2] 129:10-16), Ex. 9 (DHS Resp. to RFA Nos. 3-4).[3]

## B.   Defendants' Policies and Practices Causing and Exacerbating the Harms of Lengthy Detention without Presentment

### 1.   Booking Process

In this case, putative class members are detained by the San Diego Field Office of Immigration and Customs Enforcement ("ICE"), the San Diego Field Office of

---

[2] References to "ICRO" in this passage of the transcript are mis-transcribed references to "ICE-ERO."

[3] Unless otherwise noted, Exhibits cited herein are Exhibits to the Declaration of Bardis Vakili, filed concurrently herewith. Plaintiffs will make explicit when cited exhibits reference exhibits to another document. For ease of reference, all Exhibits referenced herein are also listed in the Index of Exhibits submitted with this brief.

Customs and Border Protection ("CBP") Office of Field Operations ("OFO"), and/or the San Diego or El Centro Sectors of U.S. Border Patrol ("BP") (collectively, the "Immigration Agencies").

When the Immigration Agencies decide to detain people for removal proceedings, such individuals will ordinarily spend most of their confinement in ICE custody. Ex. 4 (ICE Dep. at 120:3-11, 130:9-135:18), Ex. 5 (OFO Dep. at 124:17-125:4, 166:14-167:2; 2020-09-23), Ex. 6 (Border Patrol Dep. at 177:21-178:4, 183:12-22). The ICE San Diego Field Office typically conducts booking of people they arrest at one of its two staging facilities in San Diego and Imperial Counties. Ex. 4 (ICE Dep. at 31:6-33:13, 34:2-15, 116:1-117:9). Barring extraordinary circumstances, ICE usually finishes booking the same day, and then transfers them to one of three locations—the Otay Detention Center ("OMDC"), Imperial Regional Detention Facility ("IRDF"), or when bed space is limited, the San Luis Regional Detention Center ("SLRDC"). *Id.* at 30:8-31:2, 33:6–34:1, 117:22-120:11; *see also* Declaration of Dr. Tom Wong ("Wong Decl.") ¶ 17 (████████████████████████████████████████).

In addition to those who ICE itself apprehends, others who end up in ICE custody may have been initially arrested by a CBP component agency. Ex. 4 (ICE Dep. at 131:8-147:22-149:6); Ex. 5 (OFO Dep. at 124:17-125:4, 166:14-167:2); Ex. 6 (Border Patrol Dep. at 177:21-178:4, 183:12-22). One CBP component agency, the San Diego Field Office for OFO, processes people at the several ports of entry along the California-Mexico border. Ex. 5 (OFO Dep. at 25:8-26:9, 39:9-16). If primary and secondary inspection reveal that a person's admissibility is in question, OFO sends the case to the Admissibility Enforcement Unit, where the most frequent processing dispositions are NTAs, expedited removals with credible fear, and withdrawals of applications for admission. *Id.* at 44:8-45:21, 47:13-48:1, 111:1-9. During booking and while awaiting transfer to ICE, OFO often confines people for days in holding cells at

the San Ysidro and Calexico ports of entry or sometimes in Border Patrol's Barracks 5 facility. *Id.* at 25:8-26:9, 39:9-41:1, 51:17–52:4, 78:5-9, 81:7-21.

The San Diego and El Centro Sectors of U.S. Border Patrol, another component of CBP, operate between ports of entry along the border. Ex. 6 (Border Patrol Dep. at 33:12-19). When they arrest and process people for civil immigration enforcement, they confine those people in Border Patrol facilities until they can be transferred to ICE. *Id.* at 49:10–14; Vakili Decl., Ex. 8 (Defendant DHS's Responses to Plaintiffs' Second Set of Interrogatories (Aug. 14, 2020), Resp. to Interrog. No. 13).

Although the Immigration Agencies may transfer people in their collective custody among their different detention facilities, they are all DHS component agencies, and the INA does not distinguish among them. *See* 8 C.F.R. § 100.1. Whichever agency makes the initial arrest and whatever the reason for it, the initial booking procedures do not vary in terms of timing or general process: Defendants process people they arrest by running background checks, completing various forms, and conducting an interview of the arrested person. Ex. 4 (ICE Dep. at 36:13-39:14, 48:13-50:21, 85:8-11, 133:5-136:2); Ex. 5 (OFO Dep. at 79:19-83:17, 85:9-86:1); Ex. 6 (Border Patrol Dep. at 51:9-53:6). The specific forms may vary depending on the whether the case involves an NTA for regular removal proceedings or a credible fear claim, but in practice the different forms do not impact the timing for completion of booking. Ex. 4 (ICE Dep. at 133:5-136:2); Ex. 5 (OFO Dep. at 64:8-12, 98:2-14, 99:7-100:2, 105:20-108:2, 121:12-122:1); Ex. 5.1 (exhibit 99 to OFO Dep., CBP OFO Trainee Guide); Ex. 6 (Border Patrol Dep. at 57:18-58:9); Ex. 8 (DHS Resp. to Interrog. No. 16). Regardless of which agency made the initial arrest, the Immigration Agencies usually complete the booking process "within hours," but no later than 48 hours in the absence of exceptional circumstances. Ex. 4 (ICE Dep. at 46:1–9, 76:13-22, 77:15-78:11, 108:4–8, 138:8-14) (noting "the majority of these custody determinations are made within hours."); Ex. 5 (OFO Dep. at 79:19-80:13, 81:13-88:21, 98:2-100:2 (explaining that people in OFO custody typically

wait 1-2 days in custody before being processed through a sworn interview, which usually takes an hour); Ex. 6 (Border Patrol Dep. at 52:5-55:10, 59:8-62:4, 120:20-121:21) (█████████████████████████████████████ █████████).

### 2.      Presentment Delays and Policies that Contribute to Them

Despite completing the initial booking process well within 48 hours, the Immigration Agencies' regular practice is to keep people they allege to be removable imprisoned for weeks or months before presenting them to an IJ for their first hearing in removal proceedings, known as an initial Master Calendar Hearing ("MCH"). Wong Decl. ¶¶ 22–23; Answer, ECF No. 66 ¶ 33. As Plaintiffs have explained, in practice the initial MCH resembles the arraignment—not a first appearance—in a criminal case, with the IJ taking the equivalent of a plea to the charges, among other procedural matters, but the first judicial appearance required by due process need not be as comprehensive in either criminal or immigration detention. ECF No. 50-1 at 12:12-20 (citing *United States v. Gaines*, 555 F.2d 618, 625 n.8 (7th Cir. 1977) (distinguishing between first appearance and arraignment); Cal. Penal Code §§ 825(a), 849(a) (first appearance), 988 (arraignment)). For convenience, Plaintiffs will refer to the initial hearing in the removal process as an initial MCH, but the Court need not decide now whether due process requires the full scope of an initial MCH at a first appearance for people detained by the Immigration Agencies.

In fiscal year 2019, the most recent full year for which Defendants produced data,[4] putative class members, whether originally apprehended by ICE or CBP, spent

---

[4] As noted in Dr. Wong's Declaration, data referenced in his declaration and this motion was provided in discovery by Defendants and included spreadsheets listing uniquely identified people in ICE custody who had an initial MCH in Imperial or Otay Mesa immigration courts between October 1, 2016 (when the government's 2017 fiscal year began) and November 22, 2019, when Defendant EOIR ran their data, as well as certain information about their cases. Wong Decl. ¶ 9.

1  mean of about ███████ with a median of about ██████ in ICE custody before their

2  initial MCH. Wong Decl. ¶ 22(c). When CBP is the arresting agency, ████████████

3  ████████████████████████, to this detention time prior to transfer to ICE,

4  despite CBP policy that people should not remain in its custody longer than 72 hours.

5  Ex. 5 (OFO Dep. at 147:19-151:9); Ex. 6 (Border Patrol Dep. at 154:4-12, 158:12-

6  162:22); Ex. 6.1 (████████████████████████████████████████████

7  ██████████████████████████); Wong Decl. ¶ 33 (██████████

8  ████████████████████████████████████████████████

9  ████████████).

10  Several system-wide policies contribute to these delays. For instance, ICE does

11  not consider the immigration court's capacity to process cases promptly when choosing

12  to detain people. Answer, ECF No. 66 ¶¶ 6, 62. Instead, ICE packs its detention centers

13  in the San Diego Field Office. From FY 17 to FY 19, ████████████████████

14  ████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████. Wong Decl. ¶ 37; Vakili Decl. Ex. 7 (██████████████

17  ████████████████████, Rule 30(b)(6) Witness for Executive Office for

18  Immigration Review, Dep. Tr. ["EOIR Dep."] at 148:2-8). In addition, whereas ICE

19  used to release, pursuant to its parole authority,[5] a significant number of people seeking

20  asylum who passed their credible fear interviews, the San Diego Field Office of ICE

21  denied parole to ██████ of such individuals between FY 17 and FY 19. Wong Decl.

22  ¶ 35; *cf. Damus v. Nielsen*, 313 F. Supp. 3d 317, 339 (D.D.C. 2018) (noting in five ICE

23  field offices a shift from roughly 90% parole grant rates before 2017 to nearly 100%

24

25  _____

26  [5] ICE Parole Directive, ICE Directive 11002.1, Parole of Arriving Aliens Found to
   Have a Credible Fear of Persecution or Torture (Dec. 2009), *available at*

27  https://www.ice.gov/doclib/dro/pdf/11002.1-hd-
   parole_of_arriving_aliens_found_credible_fear.pdf.

28

1   parole denial rates after 2017). For asylum seekers in IRDF, ICE granted parole in a

2   ▮▮▮▮▮▮▮▮▮▮▮ credible fear cases during this period. Wong Decl. ¶ 35.

3          Uniform CBP detention policy in this district also contributes to delays. Other

4   than rare circumstances such as medical emergencies, OFO and San Diego and El

5   Centro Border Patrol Sectors have blanket policies refusing to release people from their

6   custody before ICE takes custody, despite their clear legal authority to do so, and

7   Border Patrol does not process cases any differently or more expeditiously when class

8   members request IJ review of Border Patrol's blanket custody determinations. Ex. 5

9   (OFO Dep. at 94:18–96:3, 97:16-98:1, 111:21-112:9, 130:22-131:5); Ex. 6 (Border Patrol

10   Dep. at 121:9-13, 122:10-123:15, 132:8-133:11). CBP in this district does not file

11   requests for IJ bond hearings with the immigration court. Ex. 9 (DHS Resp. to RFA

12   No. 2).

13          Apart from their choices to detain far more people than legally required or

14   justified, the Immigration Agencies have processing policies that contribute to delays

15   as well. For example, when ICE issues an NTA, it does not have the issuing agent in

16   the staging facility immediately file the NTA with immigration court, instead instituting

17   a policy that permits additional 48-hour delay to actually file the NTA after issuing it.

18   Ex. 4 (ICE Dep. at 213:12-216:18, 219:22-220:7). Despite having the technological

19   ability to do so, ICE's only explanation for this delay was that "[i]t just comes down to

20   the way things are divided in the structure of the Field Office" and that Defendant

21   Department of Justice had not provided sufficient access to EOIR's online portal. *Id.*

22   at 220:14-223:12. Even worse, for cases in which people in CBP custody will be

23   transferred to ICE, CBP in this district simply does not file NTAs with immigration

24   court as a matter of policy and practice, abdicating its admitted legal authority and

25   technological ability to do so, and despite the fact that they do so in other kinds of

26   removal cases. Ex. 5 (OFO Dep. at 141:10-144:21); Ex. 5.2 (exhibit 103 to OFO Dep.,

27   Instructions for OFO to file NTAs in cases involving the so-called Migrant

28

"Protection" Protocols or "MPP"); Ex. 6 (Border Patrol Dep. at 78:4-80:16); Ex. 9 (DHS Resp. to RFA No. 1). CBP is aware that if bed space in the San Diego Field Office of ICE is unavailable and ICE cannot find alternative placement, these policies will result in longer time spent in CBP custody, yet the agency does it anyway. Ex. 5 (OFO Dep. at 95:6-95:15, 97:14-98:1, 154:3-154:12); Ex. 6 (Border Patrol Dep. at 138:4-140:15, 155:1-7, 156:4-8, 157:21-158:11, 170:5-21).

Defendant EOIR also employs common policies that contribute to the violations of class members' rights. The immigration courts' regular practice in this district is not to hold individuals' initial MCH for weeks after receiving the NTA from ICE. In FY 19, the most recent year for which data was provided, the delay between the immigration court receiving the NTA – sometimes long after the person entered custody – and holding the initial MCH was on ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████. Wong Decl. ¶ 30.

Like all Defendants, EOIR's interpretation of 8 U.S.C. § 1229(b)(1) as a law forbidding prompt presentment also contributes to delays. Ex. 7 (EOIR Dep. at 74:5-75:21, 77:5-21, 179:20-180:3) (indicating an initial MCH could be scheduled sooner than 48 hours after receiving the NTA if not for section 1229(b)(1)'s requirements). Section 1229(b)(1) provides a safeguard to prevent railroading alleged non-citizens (whether detained or not) into removal by permitting an optional 10-day grace period after "service of the notice to appear," to find counsel before substantive aspects of the removal case can begin. 8 U.S.C. § 1229(b)(1). It is not relevant to custody issues, which are "separate and apart" from removal hearings, 8 C.F.R. § 1003.19(d), and is consistent with the constitutional safeguard against unlawful detention provided by a prompt presentment hearing, which need not involve issues on the merits of a removal case and

which furthers the right to obtain counsel. The Court need not resolve this question of statutory interpretation to certify the class. For present purposes, it suffices to note that Defendants' policy interpreting the statute is common across the class and contributes to presentment delays.

### 3.    Policies Exacerbating the Harms Caused by Delays

Common factual issues also exacerbate the harm caused by the delays. For instance, despite its nominal classification as "civil detention," ICE detention is criminal-like: ICE forces its prisoners to wear color-coded uniforms, confines them to a housing unit, gives them limited time outdoors, permits only limited visitation from family and requires prisoners to endure a strip search if they want to have actual physical contact with their loved ones, records their personal telephone calls, denies them access to the internet, pays them no more than ███ for a full shift of work in custodial, janitorial, or landscaping jobs. Answer, ECF No. 66 ¶¶ 50-57.

Yet unlike criminal custody, the INA does not permit the appointment of free counsel, 8 U.S.C. § 1362, meaning significant numbers of class members go unrepresented. Ex. 7 (EOIR Dep. at 91:22-93:4, 192:15-193:4). Lack of counsel intensifies the need for prompt presentment to a neutral adjudicator for, among other things, rights advisals. *See, e.g.*, Vakili Decl., Ex. 12 (Declaration of Muhammad Tayyab ¶¶ 10-12).

The prevalence of language barriers also exacerbates the harms of delay. From FY 17 to FY 19, there have been ████████████████████████████████ ███████████) whose primarily language was not English, Wong Decl. ¶ 21, yet the vast majority of forms provided to class members to purportedly explain their rights are in English. Ex. 4 (ICE Dep. at 97:22-98:4); Ex. 5 (OFO Dep. at 117:20-121:11); Ex. 6 (Border Patrol Dep. at 73:5-19, 165:15-166:16). Even for those who understand English, the Immigration Agencies dump piles of these forms on class members after processing, all written in lengthy, technical legalese. *See* Vakili Decl., Ex. 1 (Cancino

1    Decl. ¶ 7); Ex. 10 (██████████████████, Dep. Tr. ["████ Dep."] at 256:3-17,

2    263:10-22).

3        For those in CBP custody, the conditions in hold rooms exacerbate the harms

4    of detention beyond even imposed by ICE detention, as Defendants themselves

5    acknowledge these spaces are not suitable for extended detention. Ex. 5 (OFO Dep. at

6    148:20-150:7). Lights remain on 24 hours a day, there is no outdoor time or even

7    windows to the outside, there are no beds, bathrooms are exposed other than a low

8    partition, family visits and confidential legal visits are not permitted, only collect or non-

9    private phone calls may be made, and people locked inside have no access to forms in

10   their immigration cases. *Id.* at 188:7-191:2; Ex. 6 (Border Patrol Dep. at 204:2-206:19).

11   For many in CBP custody, the vast majority of whom are asylum seekers, contact with

12   the outside world is essentially cut off for days.

13       Collectively, these uniform policies work tremendous hardship on all class

14   members, who languish in DHS custody for weeks or longer without a hearing at which

15   a neutral adjudicator informs them of the charges against them, the reasons for their

16   custody, or their rights and any applicable procedures for regaining their freedom.

17   Regardless of which DHS component's custody they are in, how many times they have

18   been passed off to a different detention center, what language they speak, whether they

19   have children at home or are alone and new in this country, what type of relief they are

20   seeking, or the reason for their detention, all class members are left in the same

21   predicament, navigating a Byzantine maze of detention and immigration laws for

22   agonizingly long periods without seeing a judge.

23   **C.    Plaintiffs' Experiences with Defendants' Policies**

24       Plaintiffs' experiences, described in detail in prior briefing, *see, e.g.*, ECF No 35 at

25   6-8, are typical of the experiences and harms suffered by the class and demonstrate why

26   immaterial procedural differences do not exempt class members from the harms of

27   Defendants' policies and practices. Each Plaintiff was originally apprehended by a

28

different component of DHS—Jose Cancino Castellar by ICE, Ana Maria Hernandez Aguas by CBP Border Patrol, and Michael Gonzalez by CBP OFO—and each ultimately applied for and obtained different relief against removal. *Id.* But these distinctions made no difference in their delayed presentment. Each was detained longer than a month before their initial appearance before an IJ. *Id.*

ICE arrested Plaintiff Cancino Castellar on February 17, 2017 while he was still in the 12th grade. Ex. 1 (Cancino Decl. ¶¶ 2, 5). Despite noting on his I-213 that Mr. Cancino Castellar was a student with no criminal history, had lived in the U.S. since age 5, and had younger U.S. citizen siblings at home, an ICE Officer recommended he be incarcerated for removal proceedings. Ex. 10 (█████ Dep. at 150:14-152:17, 156:10-19, 161:4-7, 221:19—227:12); Ex. 10.1 (Cancino Castellar I-213). The Officer testified that her practice was to never recommend release and that her supervisor's regular practice was to concur. Ex. 10 (█████ Dep. at 196:8-14, 204:9-205:14, 225:12—227:12). The Officer issued his NTA four days after he was taken into custody, serving it to him with a stack of "complicated" documents that he did not understand. Ex. 1 (Cancino Decl. ¶ 7); Ex. 10 (█████ Dep. 205:7-206:1, 251:17-252:7, 256:9-16, 263:18-22). ICE did not file the NTA with the immigration court until February 24, 2017, three days later. ECF No. 60-1 at 8:17-18. It took another two weeks before EOIR, on March 8, 2017, scheduled his initial MCH for March 23, 2017. *Id.* at 8:19-20.

Border Patrol arrested Plaintiff Hernandez Aguas on February 7, 2017, near her home in Escondido where she lived with her two U.S. citizen children, then ages eight and two. Vakili Decl., Ex. 2.1-2.2 (Hernandez Aguas Decl. ¶¶ 3-4). She was taken first to a Border Patrol station in San Clemente for processing, and then to the Border Patrol Station in Chula Vista, where she remained until February 12, 2017. *Id.* ¶¶ 5-6; ECF No. 60-1 at 9:14. Border Patrol issued her NTA on February 7, but consistent with Border Patrol policy not to give people in its custody copies of the NTA or any other paperwork, they did not allow her to retain a copy of the NTA or any other documents

created during her processing. Ex. 2 (Hernandez Aguas Decl. ¶¶ 9, 11); Ex. 6 (Border Patrol Dep. at 70:11–73:8). On February 12, 2017, Ms. Hernandez Aguas was transferred to SLRDC for two days, and then to OMDC. ECF No. 60-1 at 9:14-16. On February 21, two weeks after she was arrested, ICE filed her NTA with the immigration court. Ex. 6.2 (exhibit 2 in Border Patrol Dep., Hernandez Aguas NTA). She saw an IJ for the first time at a bond hearing on March 13, 2017.[6] ECF No. 60-1 at 9:21-25. In theory, a bond hearing must be scheduled "as soon as possible," Ex. 7 (EOIR Dep. at 140:12–19), but her bond hearing did not take place for over a month after she entered custody.

CBO OFO arrested Plaintiff Michael Gonzalez at the San Ysidro Port of Entry on November 17, 2016. Vakili Decl., Ex. 3 (Gonzalez Decl. ¶¶ 4, 5). He asserted a fear of persecution if returned to Mexico and made a claim to U.S. citizenship. *Id.* CBP detained him for 6 days at San Ysidro and the Border Patrol transit station Barracks 5, before transferring him to OMDC on November 23, 2016. ECF No. 60-1 at 10:8-9; Vakili Decl., Ex. 11 (███████ Dep. Tr. at 226:4–227:13). Mr. Gonzalez was provided a credible fear interview on December 16, 2016 and found to have a credible fear the same day. ECF No. 60-1 at 10:10-11. On January 9, 2017, ICE served him with an NTA, but they did not file it with the immigration court until 10 days later on January 19, 2017. *Id.* at 10:11-14. His initial MCH was not held until March 14, 2017.[7] *Id.* at 10:15-17.

---

[6] Ms. Hernandez Aguas's removal proceedings were subsequently administratively closed. ECF No. 60-1 at 10:1-2.

[7] Mr. Gonzalez was subsequently found to qualify for appointed counsel under the settlement in *Franco-Gonzalez v. Holder*, CV 10-02211 DMG (DTBx), 2013 WL 3674492, at *8 (C.D. Cal. Apr. 23, 2013). Vakili Decl. ¶ 9. In July 2019, he was granted withholding of removal and released from custody. *Id.*

### D.   Plaintiffs Seek to Represent a Class Based on the Record as Developed

Plaintiffs seek to vindicate the prompt presentment rights of all class members, to protect them from suffering similar harms as Plaintiffs. Accordingly, based on the record developed in discovery, Plaintiffs seek to represent a class defined as:

> All individuals, other than unaccompanied minors or individuals with administratively final removal orders, who (1) are or will have been in the civil custody of the San Diego Field Office of ICE, the San Diego Field Office of CBP Office of Field Operations, the San Diego Sector of U.S. Border Patrol, and/or the El Centro Sector of U.S. Border Patrol, collectively, for longer than 48 hours and (2) have not had a hearing before an immigration judge.

As this Court has noted, although a court is ordinarily "bound to class definitions provided in the complaint … [t]he primary exception to this principle is when a plaintiff proposes a new class definition that is *narrower* than the class definition originally proposed, and does not involve a new claim for relief." *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 621 (S.D. Cal. 2015) (emphasis in original)

Here, the proposed class definition is far narrower than that proposed in the Complaint, because it excludes a number of categories of individuals who fell within the original definition. Specifically, in opposing Plaintiffs' original motion for class certification, Defendants noted that the class definition had included unaccompanied minors, "criminal aliens," and people in "withholding-only" proceedings after reinstatement of a removal order. ECF No. 30 at 15 n.17, 20-22. This narrower class definition excludes each of those categories of individuals. Unaccompanied minors are explicitly excluded, "criminal aliens" are excluded by the limitation to people in "civil custody," and people in "withholding-only" proceedings fall into the exclusion of people with "administratively final removal orders," *see Padilla-Ramirez v. Bible*, 882 F.3d 826, 836 (9th Cir. 2017) (finding that people in withholding-only proceedings have

administrative final removal orders). Although the class continues to include people in the expedited removal process awaiting a credible fear interview – as their expedited removal orders are not enforceable and therefore not final – it is far narrower than before.

The class definition has been otherwise refined in one small way that does not "involve a new claim for relief." *Bee, Denning, Inc.*, 310 F.R.D. at 621. Although the Complaint defined the class to include persons detained in this district, ECF No. 1 ¶ 68, Plaintiffs recently learned in discovery that the San Diego Field Office of ICE detains people in SLRDC and San Diego Sector of Border Patrol detains people in the Newton and Azrak Border Patrol Station in Murrieta, each just outside this district. Ex. 4 (ICE Dep. 33:6-34:1), Ex. 8 (DHS Resp. to Interrog. 13). Accordingly, the class definition was adjusted to include people detained by the Immigration Agencies operating in this district, not only people physically detained in this district. This minor refinement is necessary to correspond to Defendants' operational reality that their Areas of Responsibility include two facilities that lie just outside this district and does not reflect any new legal theory or claim.

Despite the slight tweak, the class definition is still far narrower than that originally proposed and presents no new legal claim. It should provide no obstacle to certification.

## III.   ARGUMENT

The class meets all the requirements of Rule 23(a), and this case squarely fits within Rule 23(b)(2). Accordingly, Plaintiffs have a "categorical" right "to pursue [their] claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Courts routinely certify classes in cases involving claims arising from immigration detention. *Doe v. Wolf*, 424 F. Supp. 3d 1028 (S.D. Cal. 2020); *Rodriguez v. Hayes*, 591 F.3d 1105, 1126 (9th Cir. 2010); *Padilla v. US Immigration & Customs Enf't*, No. C18-928 MJP, 2019 WL 1056466, at *1 (W.D. Wash. Mar. 6, 2019); *Aleman-*

*Gonzalez v. Sessions*, 325 F.R.D. 616, 629 (N.D. Cal. 2018); *Rivera v. Holder*, 307 F.R.D. 539, 551 (W.D. Wash. 2015); *Garcia v. Johnson*, No. 14–cv–01775–YGR, 2014 WL 6657591, at *1 (N.D. Cal. Nov. 21, 2014); *Franco-Gonzalez v. Napolitano*, CV 10–02211 DMG (DTBx), 2011 WL 11705815, at *16 (C.D. Cal. Nov. 21, 2011); *Alcantara v. Archambeault*, No. 20CV0756 DMS (AHG), 2020 WL 2315777, at *7 (S.D. Cal. May 1, 2020). This Court should do the same.

### A. The Proposed Class Satisfies Rule 23(a)'s Requirements

#### 1. <u>Numerosity</u>: The proposed class consists of thousands of immigration detainees.

To qualify for certification, a class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The proposed class, which includes thousands of people, plainly meets that requirement.

Defendants identified ▆▆▆ people who, from FY 2017 until November 22, 2019, while detained by the San Diego Field Office of ICE longer than 48 hours and had initial MCHs in the San Diego, Otay Mesa, or Imperial immigration courts. Wong Decl. ¶ 11. The "exact size of the class need not be known so long as general knowledge and common sense indicate that it is large," which is the case here. *Perez-Funez*, 611 F. Supp. at 995; *cf. Rivera*, 307 F.R.D. at 550 (class of more than forty current immigrant detainees sufficient); *Franco-Gonzalez*, 2011 WL 11705815, at *9 (class of fifty-five immigrant detainees sufficient). In addition, the class is transitory and includes individuals who will be detained in the future, making joinder of those individuals impracticable. *Doe*, 424 F. Supp. 3d at 1040; *Lyon v. U.S. Immigration & Customs Enforcement*, 300 F.R.D. 628, 635-36 (N.D. Cal. 2014); *J.D. v. Nagin*, 255 F.R.D. 406, 414 (E.D. La. 2009); *Hawker v. Consovoy*, 198 F.R.D. 619, 625 (D.N.J. 2001); *Clarkson v. Coughlin*, 145 F.R.D. 339, 348 (S.D.N.Y. 1993). The proposed class thus satisfies the numerosity requirement of Rule 23(a)(1).

### 2.   __Commonality__: Several common questions of law and fact exist among the class members.

Commonality exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs need not show "that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single significant question of law or fact.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (*citing Wal–Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)).

This case presents ample factual and legal questions common to the entire class, including but not limited to:

- Whether Defendants have a policy and practice of denying prompt judicial presentment to class members;

- Whether Defendants' other policies and practices contribute to delays in presentment;

- Whether the delays in judicial presentment faced by all class members violate their rights under the substantive component of the Due Process Clause of the Fifth Amendment, ECF No. 63 at 27;

- Whether Defendant's policies and practices of delaying judicial presentment violate the Administrative Procedure Act, *id.* at 44-45.

Each of those questions is "capable of classwide resolution" with "common *answers* apt to drive the resolution of the litigation," because they seek the enforcement of "a constitutional floor equally applicable" to everyone in the class. *Lyon v. U.S. Immigration & Customs Enf't*, 308 F.R.D. 203, 211-12 (N.D. Cal. 2015) (emphasis in original); *Doe*, 424 F. Supp. 3d at 1040–1041. Indeed, a class action may be the only way to provide relief, as individual suits could all become moot if the Court is unable to act before detained persons receive a first hearing. *Doe*, 424 F. Supp. 3d at 1038-39–1041; *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998); *Rodriguez I*, 591 F.3d at 1123.

In fact, *Rodriguez I* is directly on point. There, a class of immigration detainees challenged their prolonged detention for "more than six months without a bond hearing while engaged in immigration proceedings." *Rodriguez I*, 591 F.3d at 1111. The government opposed certification because, *inter alia*, detainees were held under different provisions of the INA, which conferred upon them different rights to a bond hearing. *Id.* at 1122. In holding the class satisfied Rule 23(a)(2), the Court concluded that the various statutes authorizing detention of different class members did not materially impact whether there was "some shared legal issue or a common core of facts" regarding class members' right to a bond hearing, which "the proposed members of the class certainly have." *Id.* at 1122-23. Thus, it is irrelevant that, as Defendants previously argued, members of the class may be detained pursuant to different statutes. ECF 30 at 14. All that is needed is a single "shared legal issue or a common core of facts" regarding the due process claim for prompt judicial presentment, which "the proposed members of the class certainly have." *Rodriguez I*, 591 F.3d at 1122–23. As this Court has recognized, "[t]he existence of shared legal issues," even "with divergent factual predicates is sufficient." *Al Otro Lado, Inc. v. Wolf*, No. 17-CV-02366-BAS-KSC, 2020 WL 4530755, at *6-7 (S.D. Cal. Aug. 6, 2020).

Nor does it matter whether some class members are "arriving" asylum seekers detained at the border when attempting to enter the United States, such as Mr. Gonzalez, while others were apprehended inside the United States, such as Mr. Cancino Castellar and Ms. Hernandez Aguas. Regardless of how and where class members were arrested, this Court has already held they share the same substantive due process right to prompt judicial presentment. ECF No. 63 at 27. Likewise, it is irrelevant whether some class members were detained longer than others, because all class members experience lengthy delays that fall below the permissible constitutional floor, regardless of their procedural history. *See* Wong Decl. ¶¶ 24-25 (███████████████████████████

███████████████████████████████████████████████████████

1   ████████████████████████); ECF No. 63 at 16:7-16 (citing

2   *Coleman v. Frantz*, 754 F.2d 719 (7th Cir. 1985) (finding 18-day detention without

3   presentment unlawful). The "fact that 'precise practices' among" the Immigration

4   Agencies may "differ does not mean that a constitutional or statutory floor does not

5   apply equally to all…" *Al Otro Lado, Inc.* 2020 WL 4530755, at *6-7. This action

6   therefore satisfies the commonality requirement of Rule 23(a)(2).

7           **3.     <u>Typicality</u>: Plaintiffs' claims are typical of, if not identical to,
              those of other class members.**

8

9           Typicality exists if "the claims or defenses of the representative parties are typical

10  of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under this permissive

11  standard, "representative claims are 'typical' if they are reasonably coextensive with

12  those of the absent class members; they need not be substantially identical." *Parsons v.*

13  *Ryan*, 754 F.3d 657, 685 (9th Cir. 2014). "The test of typicality is 'whether other

14  members have the same or similar injury, whether the action is based on conduct which

15  is not unique to the named plaintiffs, and whether other class members have been

16  injured by the same course of conduct.'" *Id.*

17          The representative Plaintiffs meet that standard, as they suffered violations and

18  harms similar to and typical of those suffered by the class. Mr. Cancino Castellar and

19  Ms. Hernandez Aguas each spent 34 days in ICE custody without seeing an IJ. ECF

20  No. 28-2, Ex. C, L. This is typical of the rest of the class, which in FY 2017, spent on

21  average ████████ in ICE custody before their initial MCH. Wong Decl. ¶ 22(a).

22          Similarly, Mr. Gonzalez was detained for 117 days before judicial presentment.

23  ECF No. 28-2, Ex. U. When Mr. Gonzalez presented himself at the San Ysidro Port of

24  Entry on or about November 17, 2016, CBP processed him for an asylum claim after

25  he expressed a fear of removal, as it has done for scores of other class members. Ex. 3

26  (Gonzalez Decl. ¶ 7); Wong Decl., Ex. C-7 (ICE Spreadsheet "Details#3_5" tab, listing

27  all credible fear cases, *see* column V). Mr. Gonzalez waited approximately four weeks

28

1    for a credible fear interview from an asylum officer, after which he was referred to
2    immigration court, but he did not appear before a judge until March 14, 2017. Ex. 3
3    (Gonzalez Dec. ¶¶ 7-10.); ECF 28-2, Ex. U. The time he waited for a credible fear
4    interview was typical of the class, who waited on average ████████ for credible fear
5    interviews during FY 2017. Wong Decl. ¶¶ 24(a), 26 (████████████████████
6    █████████████████████████████); *see also* Ex. 12 (Tayyab Decl.) (33 days to
7    credible fear interview).

Because Plaintiffs have "raise[d] similar constitutionally-based arguments and are
alleged victims of the same practice of prolonged detention while in immigration
proceedings," their claims are typical of those of other class members. *Rodriguez, I*, 591
F.3d at 1124. This case therefore satisfies the typicality requirement of Rule 23(a)(3).

4.    **Adequacy: Plaintiffs will adequately protect the interests of the proposed class, and their counsel are more than qualified to litigate this action.**

Adequacy exists if "the representative parties will fairly and adequately protect
the interests of the class." Fed. R. Civ. P. 23(a)(4). "Whether the class representatives
satisfy the adequacy requirement depends on the qualifications of counsel for the
representatives, an absence of antagonism, a sharing of interests between
representatives and absentees, and the unlikelihood that the suit is collusive." *Rodriguez
I*, 591 F.3d at 1125. Those standards are all met here.

Class counsel are attorneys from the ACLU Foundation of San Diego and
Imperial Counties ("ACLUF-SDIC"), Fish & Richardson P.C., and the Law Office of
Leonard B. Simon. Vakili Decl. ¶ 4. ACLUF-SDIC attorneys have participated as class
counsel in many immigration detention cases before this Court and others. *Id.* ¶ 5. Fish
& Richardson P.C. has served as *pro bono* counsel in a class action case involving indigent
plaintiffs and obtained significant relief. *Alford v. County of San Diego*, 151 Cal. App. 4th
16 (2007). Mr. Simon has litigated hundreds of class actions during a forty-year career

and taught law school courses on class actions and on complex civil litigation. *See, e.g.*, https://www.rgrdlaw.com/attorneys-Leonard-B-Simon.html (last visited Oct. 15, 2020). Class counsel are abundantly qualified. *Lynch v. Rank*, 604 F. Supp. 30, 37 (N.D. Cal. 1984), *aff'd*, 747 F.2d 528 (9th Cir. 1984).

Plaintiffs are adequate class representatives. They seek no relief for themselves through this case beyond the relief sought for the entire class and have no interests adverse to the class. ECF No. 1, Complaint ¶¶ 75-90, Prayer for Relief. This is a genuinely adverse case involving no collusion with Defendant-Respondents. Accordingly, this case satisfies the adequacy requirement of Rule 23(a)(4).

**B.      This Case Satisfies Rule 23(b)(2) Because it Seeks to Declare Illegal and Enjoin a Practice that Applies to the Class as a Whole.**

This action warrants certification because "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Plaintiffs satisfy Rule 23(b)(2) because they "complain of a pattern or practice that is generally applicable to the class as a whole." *Rodriguez I*, 591 F.3d at 1125 (quotation marks omitted). Indeed, Rule 23(b)(2) "was adopted in order to permit the prosecution of civil rights actions" like this one. *Walters*, 145 F.3d at 1047; *see also Parsons*, 754 F.3d at 686. The Ninth Circuit does not require "ascertainability" under Rule 23(b)(2), and even if it did, the class can be objectively ascertained. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 n.4 (9th Cir. 2017); *Hernandez v. County of Monterey*, 305 F.R.D. 132, 152 (N.D. Cal. 2015).

Defendants are acting on grounds that are generally applicable to the class because they subject all class members to the same policies or practices by detaining them without a prompt hearing before a judge. As a matter of policy or practice, the government does not require any class members to be presented to a judge within any set amount of time. Accordingly, the claim for prompt presentment can be resolved as

a unitary issue of law, because this "action concerns," at minimum, "a single policy applicable to the entire class that (if unlawful) subjects class members to unnecessary detention." *Rivera*, 307 F.R.D. at 551.

Furthermore, each of the policies described above that contribute to and exacerbate the presentment delays are applicable to all class members as a whole. Therefore, this case satisfies Rule 23(b)(2) because "members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole," and "a single injunction or declaratory judgment would provide relief to each member of the class." *Parsons*, 754 F.3d at 688; *Doe*, 424 F. Supp. 3d at1044 (Rule 23(b)(2) met where "putative class members seek the same injunctive and declaratory relief, and [CBP] policy of prohibiting access to retained counsel… is generally applicable to the entire class").

## IV.   CONCLUSION

For the reasons above, Plaintiffs respectfully request that the Court grant their motion for class certification.

Dated: October 16, 2020          Respectfully submitted,

By: */s/ Bardis Vakili*
Bardis Vakili (SBN 247783)
(bvakili@aclusandiego.org)
David Loy (SBN 229235)
(davidloy@aclusandiego.org)
ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4485

Joanna Fuller (SBN 266406) (jfuller@fr.com)

Aleksandr Gelberg (SBN 279989)
(gelberg@fr.com)
Megan A. Chacon (SBN 304912)
(chacon@fr.com)
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 678-5070

Leonard B. Simon (SBN 58310)
(lens@rgrdlaw.com)
LAW OFFICES OF LEONARD B. SIMON
P.C.
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 338-4549

**_Attorneys for Plaintiff-Petitioners_**

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on October 16, 2020 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civ LR 5.4(d).  Any other counsel of record will be served by U.S. mail or hand delivery.

/s/ *Bardis Vakili*
Bardis Vakili